JACK PAPARO, INDIVIDUALLY AND AS SURVIVING SPOUSE OF KATHERINE PAPARO, DECEASED, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

IRVING PAPARO AND RENEE PAPARO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4580–74, 4581–74.     Filed January 29, 1979.

*Laurence Goldfein* and *Arnold B. Panzer,* for the petitioners.
*Michael A. Menillo,* for the respondent.

FORRESTER, *Judge:* In these consolidated cases, respondent has determined the following deficiencies:

| Docket No. | Petitioner | Taxable year | Deficiency |
|---|---|---|---|
| 4580–74 | Jack Paparo, individually and as surviving spouse of Katherine Paparo, deceased .......................... | 1970 | $27,001.84 |
| | | 1971 | 25,217.12 |
| 4581–74 | Irving Paparo and Renee Paparo ........................... | 1970 | 36,615.68 |
| | | 1971 | 17,764.00 |

The sole issue for our decision is whether the amounts which Jack Paparo and Irving Paparo received in 1970 and 1971 from House of Ronnie, Inc., in exchange for their stock in Nashville Textile Corp. and Jasper Textile Corp., are taxable as capital gains under section 302,[1] or as dividends under section 301.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Jack Paparo (Jack) filed joint Federal income tax returns with his wife, Katherine Paparo (deceased 1971), for the years 1970 and 1971 with the District Director, Brooklyn, N.Y. He resided in Brooklyn, N.Y., at the time his petition herein was filed.

Petitioners Irving Paparo (Irving) and Renee Paparo[2] are husband and wife and filed joint Federal income tax returns for the years at issue with the District Director, Brooklyn, N.Y. At

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

[2] Petitioner Renee Paparo is a party to the instant case solely as a cosigner of a joint return with her husband, Irving Paparo. Hereinafter, we will refer to Irving Paparo as the petitioner in this docket number.

the time they filed their petition herein, they resided in North Woodmere, N.Y.

House of Ronnie, Inc. (House of Ronnie), is a corporation incorporated in 1964 under the laws of the State of New York. During the years at issue, Jack was chairman of the board of directors and his son, Irving, was president and a director of that corporation. The equity capital of House of Ronnie consists of a single class of voting common stock which, from the date of its incorporation until July 1, 1969, was held 50 percent by Jack and 50 percent by Irving.

On July 1, 1969, Jack established an irrevocable trust to which he contributed 25 percent of his stock in House of Ronnie. The trust's beneficiaries were the settlor's spouse, Katherine, daughter Beatrice Rappaport (Beatrice), and son Irving, with the latter two individuals designated as trustees. At the same time, Irving established three identical trusts for the benefit of each of his three sons, Jack Paparo, Harvey Paparo, and Russ Paparo. Each trust corpus consisted of 8 shares of House of Ronnie stock which, in the aggregate, amounted to 12 percent of Irving's stock interest in House of Ronnie. Beatrice and Stanley Rappaport were the designated trustees of each trust.

The transfer of the House of Ronnie stock by Jack and Irving to their respective trusts resulted in Jack directly and constructively owning all of the outstanding stock of House of Ronnie and Irving directly and constructively owning 91⅔ percent of the stock of House of Ronnie.[3]

Prior to 1971, House of Ronnie engaged in the business of designing and marketing women's clothes, all of which were fabricated by two captive suppliers, Nashville Textile Corp. (Nashville) and Jasper Textile Corp. (Jasper). These corporations were formed in the southeast during the respective years of 1964

---

[3]As a result of Jack and Irving's stock transfers, the stock of House of Ronnie was held in the following proportions during the period immediately preceding Mar. 30, 1970:

|  | Percent |
| --- | --- |
| Jack Paparo | 25 |
| Trust created for the benefit of Jack Paparo's family | 25 |
| Irving Paparo | 38 |
| Trusts created for the benefit of Irving Paparo's family | 12 |
|  | 100 |

The parties stipulated that all the shares of House of Ronnie held by the trusts created for the benefit of the Irving Paparo family were attributable, pursuant to sec. 318(a), to both Jack and Irving. Similarly, the shares held by the trust created for the benefit of the Jack Paparo family were attributable 100 percent to Jack and 67.3 percent to Irving.

and 1968 to ensure a stable inventory supply and a reduced labor cost. From the date of their incorporation until March 30, 1970, the outstanding common stock of both Nashville and Jasper was held by Jack Paparo, Irving Paparo, and Stanley Rappaport, in the respective amounts of 39, 39, and 22 percent. Stanley Rappaport (Stanley) is the son-in-law of Jack and brother-in-law of Irving. Since 1967, Stanley's occupation has been that of vice president and director of House of Ronnie.

The total shareholders' capital contribution to each corporation was $10,000, contributed by Jack and Irving. In addition to the capital contributed, Jack and Irving each personally guaranteed Nashville's long-term lease of its plant and equipment from the Development Authority of Nashville, Ga. Stanley contributed no capital to either Nashville or Jasper.

The stock of these corporations was issued to Stanley for business reasons, albeit Jack and Irving considered the issuance as essentially a gift to Beatrice.[4] In addition, Jack and Irving made all the management decisions concerning the activities of Nashville and Jasper. Jack, Irving, and Stanley executed shareholder agreements which remained in effect until the sale of Nashville and Jasper to House of Ronnie in March 1970. These agreements provided, in relevant part:

> The parties hereto agree to vote their shares so as to provide for the employment by the corporation of JACK, IRVING and STANLEY each under two year contracts, renewable thereafter from year to year and so long as each remains a stockholder of the corporation, at salaries to be determined in the

---

[4]The record is clear that the issuance of the stock to Stanley was for business reasons, despite the existence of any ulterior motives, as Irving Paparo so testified:

I. Paparo—Direct

Q. Explain what you mean by the business reasons.

A. The House of Ronnie had a factory in Brooklyn, New York, and employed approximately 100 people. Both my father and myself were the sole owners of that factory. We were a nonunion factory from the inception of the business. During the time of our expansion, we were told * * * that the I.L.G.W.U. was going to organize our factory in Brooklyn.

Q. For the record, would you explain what the—

A. The I.L.G.W.U. is a labor organization, which is a union, and they wanted to organize our factory. The * * * normal contract organizes the owners of the company, * * * they make the owners sign the contract, so that in the event the owners should move their factory, or open up a second factory, they are automatically organized at that factory also. * * *

> *     *     *     *     *     *     *

in the event that we should get organized in Brooklyn, in order to avoid having our southern facilities organized at the same time, we were told that if we had a third party in the southern organization—in the southern company—different than the two parties that owned the northern company, that we wouldn't have an eventual union problem there, if they should organize our Brooklyn plant. And, for that reason, Stanley Rappaport—the stock was put in Stanley Rappaport's name.

sole discretion of JACK & IRVING. Such Contracts shall require that each employee devote such time and efforts to the business of the corporation as JACK and IRVING may determine. It is the understanding of the parties that so long as JACK and IRVING are stockholders of the corporation, all corporate acts shall require their unanimous assent *and STANLEY agrees to vote his stock in the corporation according to the joint direction of JACK and IRVING.* [Emphasis supplied.]

Serious problems began to develop after the establishment of Nashville and Jasper that affected House of Ronnie. As a marketing corporation, House of Ronnie owed its principal success to Irving. For example, Irving accounted for approximately 75 percent of the sales generated in 1969. The remainder of the sales were made by a company salesman and a manufacturer's representative. Once the two southeastern plants began operations, Irving devoted more time to production planning and less time to sales development. Jack and Irving recognized the pernicious effect that this would have on total sales, so they decided to shift Irving's marketing responsibilities to an independent sales organization.

Irving approached a successful sales organization, I. Amsterdam & Co. (I. Amsterdam), which acted as a manufacturer's representative specializing in women's apparel. I. Amsterdam was owned by Messrs. Aaron, Amsterdam, Perlman, and Schneider, and they also collectively owned 80 percent of the stock of Denise Lingerie Co. (Denise), a corporation producing women's apparel.

It was Irving's idea that if House of Ronnie could acquire Denise in exchange for its stock, House of Ronnie would gain not only Denise's manufacturing facilities but also an increased sales effort on the part of I. Amsterdam. This would be accomplished by giving the concerned shareholders of Denise an equity interest in the combined enterprise. Moreover, shareholders Aaron, Amsterdam, Perlman, and Schneider were dissatisfied with the financial performance of Denise and were interested in the possibility of an offer of acquisition from House of Ronnie.

Negotiations ensued for the acquisition of Denise by House of Ronnie in the early part of 1969. Perlman, acting for the other Denise shareholders, informed Irving that the acquisition proposal was appealing but that the Denise shareholders would not consider accepting stock in a privately held corporation in exchange for their shares. It was at this juncture in the

negotiations that Irving took steps which resulted in House of Ronnie's initial stock offering to the public.

After discussions with several underwriters, the proposal of Smith, Jackson & Co., an underwriting firm specializing in new issues, was accepted. Steven Smith (Smith) was the partner of this firm actively engaged in the underwriting. He proposed, inter alia, that Nashville and Jasper be combined with House of Ronnie as a condition of the offering. Smith's primary reason for insisting that the manufacturing companies be combined with House of Ronnie was that the market for new stock issues in the garment industry was interested in companies that represented combined marketing and manufacturing operations. In addition, Smith believed that a potential conflict of interest would exist if Nashville and Jasper remained under separate ownership.[5]

To comply with the underwriter's recommendation, a contract was entered into by Jack, Irving, and Stanley during January 1970. It provided, inter alia, that they would sell all of their stock in Nashville and Jasper to House of Ronnie for a total of $800,000. The contract also stated that an effective registration statement for the House of Ronnie offering was a condition precedent to the sale and that the agreement would be deemed null and void if the offering did not occur for any reason.

Payment of the $800,000 purchase price was to be comprised of $200,000 paid at the closing, which was 30 days after the effective date of the registration statement, and $600,000 paid in three equal annual installments commencing January 2, 1971. Each installment was to be paid to Jack, Irving, and Stanley in proportion to their respective ownership interests in Nashville and Jasper; consequently, of each $200,000 installment amount, Jack, Irving, and Stanley received $78,000, $78,000, and $44,000, respectively.

Since House of Ronnie lacked the necessary funds with which to make the purchase, it was at all times assumed by the parties that the $800,000 purchase price would be funded through an initial and subsequent stock offering. According to the under-

[5]This belief was shared by House of Ronnie's counsel, Arnold Biegen, who was retained to serve as the Securities and Exchange Commission (SEC) counsel for the proposed public offering. Counsel advised Irving that there existed serious doubt as to whether the SEC would permit the House of Ronnie offering unless the conflict of interest problem was favorably resolved. At the trial, Biegen testified that it was his feeling the SEC would insist that the prospectus for the offering contain such prominent disclosure of the potential for conflicts of interest and self-dealing as to render the stock unmarketable.

writer, since House of Ronnie's objective was to acquire Denise, its acquisition would facilitate subsequent public offerings of House of Ronnie stock. Thus, the proceeds of the initial public offering could be used to make the $200,000 downpayment and, if necessary, part or all of the first $200,000 installment payment. Smith envisioned that the balance of the payments would be funded from the proceeds of a subsequent public offering within a year or two after the sale.

A public offering of the common stock of House of Ronnie was made on March 30, 1970, pursuant to a registration statement filed with the Securities and Exchange Commission (SEC), which statement became effective on said date.[6] House of Ronnie sold 86,600 newly issued shares, of which 79,600 were sold to the public at $7.50 per share and 7,000 were sold to the underwriter at $2.50 per share pursuant to an option granted in the underwriting agreement. The net proceeds derived by House of Ronnie as a result of the sale of said shares was $532,731.65. In the same offering, Jack sold a total of 28,600 shares of common stock of House of Ronnie previously held by him, of which 26,000 were sold to the public at $7.50 per share and 2,600 were sold to the underwriter at $2 per share pursuant to an option granted in the underwriting agreement. The net proceeds received by Jack as a result of his sale of said shares was $177,255.

The final prospectus indicated in what manner the $532,731.65 in proceeds from the House of Ronnie stock offering were to be used, to wit: $200,000 was applied as part payment for the acquisition of Nashville and Jasper; $50,000 was devoted to expansion of the Jasper facility, and the remaining $282,731.65 was employed in the working capital structure of House of Ronnie. The closing of the sales of Nashville and Jasper to House of Ronnie occurred within 30 days of the initial public offering. The downpayment of $200,000 was paid to Jack, Irving, and Stanley at the closing.

---

[6]Prior to the offering of the common stock of House of Ronnie, the corporation was recapitalized by increasing the authorized capital stock from 1,000 shares to 2 million shares of $0.10 par value common stock. Each shareholder received 1,320 shares of newly authorized common stock in exchange for each of the originally issued shares which he surrendered. Such recapitalization was necessary to effectuate the initial public offering. We do not reach the question raised in the most tangential fashion in respondent's brief of whether the recapitalization was a valid sec. 368(a)(1)(E) reorganization or whether it constituted some form of additional consideration to petitioners.

Immediately following the first public offering, the stock of House of Ronnie was held in the following proportions:

| Stockholder | Shares owned | Percentage of total shares outstanding |
|---|---|---|
| Jack Paparo | 102,900 | 16.79 |
| Trust created for the benefit of the family of Jack Paparo | 131,500 | 21.46 |
| Irving Paparo | 231,440 | 37.77 |
| Trust created for the benefit of the family of Irving Paparo | 31,560 | 5.15 |
| Public | 105,600 | 17.23 |
| Underwriter | 9,600 | 1.56 |
| Total | 612,600 | [1]99.96 |

[1]Due to rounding.

Therefore, subsequent to this public offering, Jack owned directly and constructively 81.17 percent of the stock of House of Ronnie and Irving owned directly and constructively 74.15 percent of the stock of House of Ronnie.[7]

By virtue of the public offering, House of Ronnie and its shareholders became subject to the many provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. For instance, House of Ronnie was required to file detailed periodic reports on its financial condition with the SEC, and its controlling shareholders and directors, Jack and Irving, were required to file reports on their personal dealings with House of Ronnie.

On October 30, 1970, House of Ronnie entered into an agreement with the stockholders of Denise for the acquisition of all of the outstanding stock of that company. Pursuant to the

[7]Jack's stock ownership in House of Ronnie totaled 81.17 percent comprised of 16.79 percent direct and 64.38 percent indirect. Such indirect ownership results from the operation of sec. 318(a). Under that section, constructive ownership of House of Ronnie stock attributed to Jack is as follows: 37.77 percent from his son, Irving; 21.46 percent from the trust established for the benefit of Jack's family (spouse, daughter, and son); and 5.15 percent from the trust established by Irving for the benefit of Jack's grandchildren.

Similarly, Irving's stock ownership amounted to 74.15 percent, composed of 37.77 percent direct and 36.38 percent indirect. Pursuant to sec. 318(a), Irving's constructive ownership of House of Ronnie stock is as follows: 16.79 percent from his father, Jack; 14.44 percent from the trust established for the benefit of Jack's family, wherein Irving held a 67.3 percent actuarial interest; and 5.15 percent from the trust established by himself for the benefit of his children.

terms of that agreement, House of Ronnie acquired all of the stock of Denise on January 11, 1971, and in exchange issued 280,000 shares of House of Ronnie, 44,000 delivered directly to the former shareholders of Denise, and 236,000 placed in escrow for issuance over the succeeding 5 years.

Immediately after said issuance, the stock of House of Ronnie was held in the following proportions:

| Stockholder | Shares owned[1] | Percentage of total shares outstanding |
| --- | --- | --- |
| Jack Paparo | 113,190 | 11.87 |
| Trust created for the benefit of the family of Jack Paparo | 144,650 | 15.16 |
| Irving Paparo | 254,584 | 26.69 |
| Trust created for the benefit of the family of Irving Paparo | 34,716 | 3.64 |
| Former shareholders of Denise | 44,000 | 4.61 |
| Stock held in escrow for future issue to former Denise shareholders | 236,000 | 24.74 |
| Public | 116,160 | 12.18 |
| Underwriter | 10,560 | 1.10 |
| Total | 953,860 | 99.99 |

[1]The shares owned are adjusted to reflect a 10-percent stock dividend declared in September 1970.

As a result of the acquisition, House of Ronnie stock was owned directly and constructively by Jack and Irving in the respective amounts of 57.4 and 52.4 percent.

A second public offering of 265,000 shares of House of Ronnie stock was made on April 20, 1972. At that time, House of Ronnie issued 225,000 shares and Jack sold 40,000 shares, all of which were offered to the public at $15 per share. The underwriter, Smith, Jackson & Co., also received warrants to purchase an additional 22,000 shares at $18 per share. Subsequent to this offering, the common stock of House of Ronnie was listed and traded on the American Stock Exchange.

House of Ronnie paid the first $200,000 installment due Jack, Irving, and Stanley for the purchase of Nashville and Jasper on January 2, 1971. It used part of the net proceeds of $3,028,500 from the second public offering to pay the bulk of the second $200,000 installment due January 2, 1972. In addition, the final

$200,000 installment due on January 2, 1973, was also paid from the proceeds of the second public offering.

As a result of the second public offering, the stock of House of Ronnie was held as follows:

| Stockholders | Shares owned[1] | Percentage of outstanding stock |
|---|---|---|
| Jack Paparo | 97,737 | 6.90 |
| Irving Paparo | 399,136 | 28.16 |
| Trust for the benefit of the family of Irving Paparo | 43,395 | 3.04 |
| Beatrice Rappaport | 78,406 | 5.53 |
| Beatrice and Stanley Rappaport | 3,750 | 0.26 |
| Former shareholders of Denise | 125,490 | 8.85 |
| Stock held in escrow for future issuance to former Denise shareholders | 224,510 | 15.84 |
| Public and underwriter | 444,901 | 31.41 |
| Total | 1,417,325 | 99.99 |

[1]The shares owned are adjusted to reflect the impact of a 5-for-4 stock split declared on Aug. 5, 1971, to every shareholder of record on Aug. 25, 1971.

Because of the second public offering, Jack owned directly and constructively, pursuant to section 318(a), 43.89 percent of the outstanding voting stock of House of Ronnie and Irving owned directly and indirectly, under section 318(a), 38.10 percent of the outstanding voting stock of the corporation.[8]

In the notices of deficiency in docket Nos. 4580–74 and 4581–74, respondent determined that the amounts received for each of the years 1970 and 1971 from House of Ronnie in connection with the Nashville and Jasper stock transfers were essentially equivalent to dividends under section 302 and properly reported as ordinary income. Petitioners treated these amounts as distributions in redemption of their stock in House of Ronnie and reported such amounts as capital gains.

[8]Under sec. 318(a) Jack constructively owned 28.16 percent from his son, Irving; 3.04 percent from the trust established by Irving for the benefit of Jack's grandchildren; and 5.79 percent from his daughter, Beatrice. To the same extent, Irving constructively owned 6.90 percent from his father, Jack; and 3.04 percent from the trust established by himself for the benefit of his children.

OPINION

Respondent argues that Jack and Irving are not entitled to treat as capital gains the amounts which each received from House of Ronnie in 1970 and 1971 in return for the transfer of their stock in Nashville and Jasper, because said amounts were essentially equivalent to dividends and properly treated as distributions of property. Petitioners' principal argument is that the amounts received from House of Ronnie were distributions in redemption of their stock and thus qualify for treatment as distributions in part or full payment in exchange for their stock.

The parties are in agreement that section 304 applies to the transaction at hand thereby characterizing the transfer of Nashville and Jasper stock to House of Ronnie as a redemption through the use of related corporations. Section 304(a)(1) provides, in pertinent part, that if one or more persons are in control of each of two corporations, and if one of those corporations acquires stock in the other corporation from the person or persons in control, then the transaction shall be treated as a distribution in redemption for purposes of section 302. Thus, section 304 directs attention to section 302 as the gauntlet which a redemption must run to qualify for treatment as an exchange.

Section 302(b) sets forth four conditions under which a redemption of stock shall be treated as an exchange. If none of these disjunctive conditions is met, section 302(d) provides that the redemption shall be treated as a distribution of property to which section 301 applies. Petitioners do not contend that section 302(b)(3) or 302(b)(4) is applicable but they argue that the transaction in question meets the test of either section 302(b)(1) or 302(b)(2).[9]

---

[9] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) IN GENERAL.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

(B) LIMITATION.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

(C) DEFINITIONS.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

Petitioners contend that the transfer of their shares in Nashville and Jasper to House of Ronnie should be characterized as not essentially equivalent to a dividend within the meaning of section 302(b)(1). The test of nondividend equivalency under that section is met, after the application of the attribution rules of section 318(a) to the stock ownership interests as they existed both before and after the redemption, when the redemption results in a meaningful reduction of the shareholder's proportionate interest. *United States v. Davis*, 397 U.S. 301, 313 (1970).

While the parties are in general agreement that the proper section 302(b)(1) test is the one enunciated in *Davis*, they disagree on whether the redemption at issue was carried out pursuant to a plan. Respondent contends that the transfer of stock by petitioners to House of Ronnie occurred in March 1970, pursuant to a contract of sale executed in January 1970. To the contrary, petitioners contend that the sale of Nashville and Jasper to House of Ronnie was an initial and necessary step of an overall financial plan which started with the first House of Ronnie public offering on March 30, 1970, and ended with the second House of Ronnie public offering on April 20, 1972.

The first issue facing us is whether the 1970 redemption was but one step in an overall plan to redeem petitioners' stock in Nashville and Jasper.

As stated in our findings of fact, prior to the sale of the Nashville and Jasper stock and before the recapitalization and public offering of House of Ronnie, the petitioners each owned directly and constructively, pursuant to section 318, 78 percent of the stock of both Nashville and Jasper. Subsequent to the sale, recapitalization, and first public offering, Jack owned 81.17

---

is less than 80 percent of—

    (ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For the purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value.

    (D) SERIES OF REDEMPTIONS.—This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

percent of both Nashville and Jasper and Irving owned 74.15 percent of the stock of both Nashville and Jasper.

Pursuant to the test described in *United States v. Davis, supra,* the distribution in the instant case has neither altered the shareholders' control over Nashville or Jasper nor the shareholders' right to future earnings. See also *Himmel v. Commissioner,* 338 F.2d 815, 817 (2d Cir. 1964). As we have stated in *Grabowski Trust v. Commissioner,* 58 T.C. 650, 656 (1972), *Davis* made clear that:

(1) the attribution rules of section 318 must apply in testing for dividend equivalency under section 302(b)(1); (2) redemptions of stock of a sole shareholder (whether an "actual" or "constructive" sole shareholder) are always "essentially equivalent to a dividend" under this subsection; (3) a business purpose motivating the redemption is irrelevant in testing dividend equivalency; and (4) the exception to dividend treatment proffered by this subsection will only obtain if the redemption results in a "meaningful reduction of the shareholder's proportionate interest in the corporation."

A substantial portion of petitioners' brief focuses on the business motivation of the individual shareholders. Unfortunately for petitioners, their desire to acquire Denise for House of Ronnie stock is irrelevant, *United States v. Davis, supra; Grabowski Trust v. Commissioner, supra.* Thus, it is the effect of the redemption and not the purpose behind it which is determinative of dividend equivalence. Cf. *Benjamin v. Commissioner,* 66 T.C. 1084, 1115 (1976); *Coates v. Commissioner,* 55 T.C. 501, 514 (1970), affd. 480 F.2d 468 (9th Cir. 1973), cert. denied 414 U.S. 1045 (1973).

In order to be entitled to capital gains treatment under section 302(b)(1), petitioners must, inter alia, prove that an overall financial plan existed which began in 1970 and ended in 1972.[10] The evidence at trial failed to disclose any such financial plan. Indeed, as the underwriter testified, the second public offering was not dependent on the first public offering. Neither the initial stock prospectus nor the written correspondence between the underwriter and petitioners disclose any such plan.

Assuming, arguendo, that such a plan of redemption was contemplated by petitioners, we perceive it to be laced with

---

[10]We do not reach the question of whether to constitute a plan, the terms of the arrangement must be firm and fixed and the steps clearly integrated. This question generally arises under sec. 302(b)(3) dealing with the complete termination (actual and constructive) of a shareholder's interest which is not the situation herein. See, e.g., *Benjamin v. Commissioner,* 66 T.C. 1084, 1113 (1976); *Niedermeyer v. Commissioner,* 62 T.C. 280, 291 (1974); *Leleux v. Commissioner,* 54 T.C. 408, 418 (1970).

contingencies. No formal written plan existed for funding the redemption through subsequent public offerings of House of Ronnie stock. At the trial, no evidence was offered of corporate minutes to substantiate such a plan. Moreover, it was speculative from the record whether such offerings would be made in light of internal labor-management problems, reduced demand for women's apparel, or a general decline in the stock market.

What is perspicuous from the record is that the time or procedure for funding the redemption through subsequent public offerings of stock was beyond the control of petitioners. In addition, the testimony of the underwriter belies any overall financial plan. While petitioners apparently intended that subsequent public offerings be made in futuro, there was no promise to sell any particular amount of stock between the underwriter and petitioners at any particular time or at any particular price.

We believe there exists a more incipient problem with petitioners' argument. If the transaction's character in the instant case is not to be determined for an indefinite and unlimited time period into the future, the basic premise of annual tax accounting would be jeopardized and administrative problems would be created. It would be wholly inconsistent with the premise of annual tax accounting to determine the essential character of a transaction by awaiting events that might or might not happen. *Commissioner v. Gordon,* 391 U.S. 83, 96 (1968).

Furthermore, section 6601(a) generally provides, inter alia, that the period of limitations on assessment and collection cannot exceed 3 years. Under petitioners' argument it is conceivable that determination of the tax character of a redemption may not be established until beyond the 3-year limitations period. Such a result also militates against the underlying policy and congressional intent of section 302(b)(1). See, e.g., S. Rept. 1622, 83d Cong., 2d Sess. 233 (1954). In addition, because of the possibility of tax character determinations beyond the statutory limitations period, an increase in extensions of this period by agreement, under section 6501(c)(4), would trigger greater administrative burdens on all parties.

Petitioners further contend that even if the effect of the transaction is measured immediately after the first public offering of House of Ronnie stock on March 30, 1970, the

transaction resulted in a meaningful reduction of petitioners' proportionate interest in Nashville and Jasper. To reach this result, petitioners argue that by virtue of the shareholder agreements executed among Jack, Irving, and Stanley, whereby Jack and Irving possessed the voting power of Stanley's shares, Jack and Irving each had constructive ownership interests of 100 percent which the redemption reduced to 81.17 percent and 74.15 percent, respectively. Petitioners would thus have this Court extend the constructive ownership of stock rules beyond section 318(a) and attribute the ownership of Stanley's shares to Jack and Irving, respectively.

Petitioners cite no cases employing this novel approach, and we have found none. In attempting to support this position, petitioners call our attention, inter alia, to cases dealing with the so-called "family hostility" exception to section 318.[11] Such cases are inapposite.

In any event, we find it unnecessary to rule on petitioners' contention for, under the facts of this case, the assumed reduction of the Nashville and Jasper stock from 100 percent for each of the petitioners to 81.17 percent for Jack and 74.15 percent for Irving does not constitute a meaningful reduction of petitioners' proportionate interest. *United States v. Davis,* *supra.* The reality of the situation is that petitioners' control of Nashville and Jasper is essentially unaltered and is not meaningfully reduced.[12] Petitioners do not seek to attribute the ownership of Stanley's shares to Jack and Irving, but only the right to vote them so long as Jack and Irving were shareholders. For example, on a dissolution, we must assume from this record that Stanley would still receive his 22 percent of the properties.

We are also unconvinced that the dramatic change in petitioners' legal and economic relationship to the subject corporations is sufficient justification for capital gains treatment of the redemption. While admittedly Nashville and Jasper, as wholly owned subsidiaries of a public corporation, are subject to a variety of SEC rules and regulations, this fact alone will not

---

[11]*Robin Haft Trust v. Commissioner,* 61 T.C. 398 (1973), Supplemental Opinion 62 T.C. 145 (1974), vacated and remanded 510 F.2d 43 (1st Cir. 1975); *Squier v. Commissioner,* 35 T.C. 950 (1961).

[12]Nor would such a reduction in ownership have any impact for State law purposes since under the New York Business Corporation Law, a two-thirds vote of all outstanding shares is sufficient to authorize a merger, consolidation, or dissolution. N.Y. Bus. Corp. Law sec. 903(a)(2) and sec. 1001 (McKinney 1963). See also Rev. Rul. 78–401, 1978–46 I.R.B. 5.

convert the transaction in the instant case from a distribution of property to a distribution in exchange for petitioners' stock.

For all of the above reasons, we do not think that the change in ownership of the Nashville and Jasper stock is a meaningful reduction of either petitioner's proportionate interest in Nashville and Jasper and we so hold. *United States v. Davis, supra.*

Petitioners also argue that the redemption meets the substantially disproportionate test of section 302(b)(2), following completion of the second public offering on April 20, 1972.[13] Since we have already decided the relevant date for measuring the tax consequences of this redemption to be March 30, 1970, the section 302(b)(2) substantially disproportionate test must be applied at that point in time. Thus, we must determine whether the March 1970 redemption meets the substantially disproportionate test of section 302(b)(2).

In order for a redemption to qualify as substantially disproportionate under section 302(b)(2), three requirements must be satisfied. First, immediately after the redemption the shareholder must own, directly and constructively, less than 50 percent of the total combined voting power of all classes of stock entitled to vote. Second, the shareholder's percentage of total outstanding voting stock immediately after the redemption must be less than 80 percent of his ownership of such stock immediately before the redemption. Last, the shareholder's percentage of outstanding voting or nonvoting common stock after the redemption must be less than 80 percent of his ownership before the redemption. The application of this tripartite test under 302(b)(2) is on a shareholder-by-shareholder basis, resulting in the possibility that a redemption may be substantially disproportionate as to one shareholder but not as to the other concerned shareholders. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.22, p. 9–16 (3d ed. 1971).

As the facts clearly indicate, the resolution of this issue is not in petitioners' favor. From our earlier discussion under section 302(b)(1), it becomes evident that neither Jack nor Irving will meet the less than 50-percent test under section 302(b)(2)(B) since Jack's interest increases from 78 percent to 81.17 percent

---

[13]After the transfer of Nashville and Jasper stock to House of Ronnie, petitioners terminated their direct ownership in these corporations. However, sec. 304(b)(1) provides, inter alia, that in applying sec. 318(a) with respect to sec. 302(b), sec. 318(a)(2)(C) and sec. 318(a)(3)(C) are to be applied without regard to the 50-percent limitation therein. Thus, petitioners each retained an indirect or constructive ownership interest in the subject corporations after Mar. 30, 1970, equal to the total of their direct and constructive interests in House of Ronnie.

and Irving's interest decreases from 78 percent to 74.15 percent. Petitioners also fail the remaining section 302(b)(2) tests because Jack's ratio of percentage owned after the redemption to percentage owned before the redemption amounts to 104.06 percent, well in excess of the less than 80-percent tests. Similarly, Irving's ratio is 95.06 percent. Consequently, neither Jack nor Irving satisfies the requirements of section 302(b)(2) as of March 30, 1970, and cannot obtain exchange treatment.

Petitioners argue in the alternative that a redemption is never essentially equivalent to a dividend under section 302(b)(1) where the purchase price is funded by the sale of shares to unrelated parties; as here, to the public. Petitioners draw an analogy in the instant case to cases wherein shares were redeemed for the purpose of reselling them to employees under stock option plans. Such an analogy is made to buttress their argument that the net effect of the redemption herein is that of an indirect sale by petitioners.

We disagree. Under petitioners' construction, they view the transaction as an exchange of Nashville and Jasper stock for House of Ronnie stock and the sale of that stock to the public via a series of stock offerings. However, for purposes of section 304(a)(1), the term property does not include stock in the corporation making the distribution (or rights to acquire such stock) pursuant to section 317(a). Thus, petitioners' "indirect sale" theory collapses under a section 304(a)(1) and section 317(a) scrutiny.

In addition, petitioners have failed to show this Court that the entire redemption was funded by the initial public offering. A perusal of the record discloses that only a portion of the redemption sales price was to be funded out of the initial public offering. We have never espoused a rule on the proper or improper funding of redemptions and we decline to do so at petitioners' behest. Neither *United States v. Davis, supra,* nor any case cited by petitioners formulates such a rule.

Accordingly, we hold from the entire record that petitioners are not entitled to treat the amounts that each received as distributions from House of Ronnie for their respective shares of stock in Nashville and Jasper, as distributions in part or full payment in exchange for their stock.

*Decisions will be entered for the respondent.*