JOHN A. HALL AND BARBARA P. HALL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF ROBERT T. SMITH, DECEASED, COLONIAL AMERICAN NATIONAL BANK, EXECUTOR, AND MARION W. SMITH, SURVIVING SPOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hall v. Commissioner
Docket Nos. 10769-80, 14642-80.
United States Tax Court
T.C. Memo 1983-140; 1983 Tax Ct. Memo LEXIS 649; 45 T.C.M. (CCH) 993; T.C.M. (RIA) 83140; March 16, 1983. *649 J corporation had 1,000 shares of common stock outstanding. Of the 1,000 shares, H owned 545 shares, H's wholly-owned corporation owned 175 shares, S's wife owned 90 shares, and S's sone owned 40 shares. On May 4, 1977, J corporation redeemed 30 shares of its stock from S's wife for $18,000. On the same day, H transferred 30 shares of his stock in J corporation to S or S's wife for $18,000. Held: J corporation's redemption of 30 shares of its stock for $18,000 and H's transfer of 30 shares of J corporation stock to S or S's wife for $18,000 were, in substance, a redemption of 30 shares of J corporation from H. Held, further: Such redemption was "essentially equivalent to a dividend" within the provisions of section 302(b)(1). United States v. Davis,397 U.S. 301 (1970). Johnson Kanady III,Gerald A. Dechow, and Joseph L. Anthony, for the petitioners in docket No. 10769-80.
Robert C. Elliot, Jr. (Trust Officer of Colonial American National Bank, Executor) and Marion W. Smith, pro se, for the petitioners in docket No. 14642-80. Richard F. Stein, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in Federal income taxes of petitioners for the taxable year 1977 in the following amounts: Docket No.
Petitioner
Deficiency
10769-80
John A. Hall and
$7,615
Barbara P. Hall
14642-80
Estate of Robert T.
980
Smith, Deceased,
Colonial American
National Bank,
Executor, and
Marion W. Smith,
Surviving Spouse
These cases were consolidated for trial, briefing, and opinion. The principal issue we must decide is whether a series of transactions on May 4, 1977, by which petitioner John A. *652 Hall sold 30 shares of common stock of John A. Hall & Company, Inc., to Robert T. Smith or Marion W. Smith and by which John A. Hall & Company, Inc., redeemed 30 shares of Marion W. Smith's common stock was in substance a redemption of John A. Hall's stock taxable to him as a dividend. A related question, which the parties apparently agree will be resolved by our decision on the primary issue, is whether petitioner Marion W. Smith realized a long-term capital gain when John A. Hall & Company, Inc., redeemed the 30 shares of her stock. [1]
FINDINGS OF FACT Some of the facts in these cases were stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners John A. Hall (hereinafter Hall) and Barbara P. Hall, *653 husband and wife, filed a joint Federal income tax return for the taxable year 1977 with the Internal Revenue Service Center at Memphis, Tennessee. At the time the petition in docket No. 10769-80 was filed, they resided in Roanoke, Virginia. Petitioner Colonial American National Bank is the executor of the Estate of Robert T. Smith, deceased. Petitioner Marion W. Smith is the surviving spouse of Robert T. Smith. At the time the petition in docket No. 14642-80 was filed, she resided in Roanoke, Virginia. Robert T. Smith (hereinafter Smith) and Marion W. Smith (hereinafter Marion) filed a joint income tax return for the year 1977 with the District Director of Internal Revenue, Richmond, Virginia. John A. Hall & Company, Inc. (hereinafter the corporation), a Virginia corporation, is engaged in the paving, grading and drainage construction business. Immediately prior to May 4, 1977, 1,000 shares of common stock of the corporation were outstanding. Of the 1,000 shares, Hall owned 545 shares, Aggregate Haulers, Inc., owned 175 shares, Marion owned 90 shares, Richard L. Smith owned 40 shares, and Thomas R. McDonald owned 100 shares. [2]Hall owns all the outstanding stock of *654 Aggregate Haulers, Inc. Richard L. Smith is the son of Mr. and Mrs. Robert T. Smith. On May 4, 1977, Hall and Smith were the corporation's president and secretary-treasurer, respectively. Prior to the death of Wiley N. Jackson (hereinafter Jackson) in October 1973, Hall and Jackson each owned 48-1/2 percent of the corporation's stock. After Jackson's death, Hall purchased Jackson's interest in the corporation from his estate pursuant to a buy-sell agreement. The purchase price of approximately $190,000 plus interest was to be paid in four equal installments. The first installment was due within 90 days after Jackson's death. Thereafter, annual payments of 25 percent of the purchase price were required. In 1976, Hall borrowed approximately $145,000 from the First National Exchange Bank (FNEB) is Roanoke, so as to discharge his indebtedness to Jackson's estate and an income tax liability he owed. The terms of the loan from FNEB required Hall to make monthly principal payments of $1,500, plus interest at the rate of 1 percent above the prime interest rate on the unpaid principal. In the winter of 1977, Hall *655 decided it would be prudent to reduce the principal amount of his indebtedness to FNEB, so as to decrease the amount of interest payable to FNEB monthly. In March or April of 1977, Hall explained his financial situation to Smith and McDonald and discussed with Smith and McDonald the possibility of each purchasing an equal amount of stock in the corporation from him. Smith and McDonald each agreed to purchase 30 shares of stock from Hall. Consequently, on May 4, 1977, Hall transferred 30 of his shares of stock in the corporation to Smith or Marion for $18,000. [3]
Also on May 4, 1977, the corporation redeemed 30 shares of its stock from Marion for $18,000. The proceeds from the redemption were deposited to a joint checking account that Mr. and Mrs. Smith maintained at Colonial American National Bank (hereinafter Colonial American). The payment for $18,000 to Hall for his 30 shares in the corporation was made by a check, numbered 1892, drawn on the same account. During May 1977 Marion maintained her own savings account at Colonial American. Smith and Marion maintained no bank *656 account other than the joint checking account and Marion's saving account at Colonial American. Aside from the redemption proceeds of $18,000 deposited to Smith and Marion's joint checking account, from April 28, 1977, to May 23, 1977, the balance of the account ranged from a low of $573.57 to a high of $1,123.90. The balance in Marion's saving account in May 1977 was $11,425. Thus, without the redemption proceeds, Smith and Marion had insufficient cash available to purchase 30 shares of stock from Hall for $18,000. In addition to the accounts described above, during 1977 Smith and/or Marion had funds invested in a certificate of deposit with Colonial American. Mr. and Mrs. Smith received dividends in 1977 from stock of Ashland Oil and Refinery, which was held by a trust created by the Smiths. [4] Such dividends were deposited to the Smiths' joint checking account and, perhaps, also to Marion's savings account. Smith first discussed the redemption of Marion's shares with Marion on May 4, 1977, the day of the redemption. The Smiths agreed to the redemption *657 of Marion's shares and subsequent purchase of Hall's shares by Smith or Marion solely to help Hall financially. Following the redemption of Marion's stock and the sale of Hall's stock to Smith or Marion, 970 shares of common stock of the corporation were outstanding. Of the 970 shares, Hall owned 515 shares, Aggregate Haulers, Inc., owned 175 shares, Marion owned 60 shares, Richard L. Smith owned 40 shares, and Smith or Marion owned 30 shares. In the notice of deficiency issued to the Halls on June 11, 1980, respondent determined that the series of stock transactions between Hall and Mr. and Mrs. Smith involving the corporation's stock "constitute a constructive redemption of 30 shares of stock [from Hall by his] controlled corporation, Further, this constructive redemption is essentially equivalent to a dividend * * *." In the notice of deficiency mailed to the other petitioners, respondent determined that they had "realized a long-term capital gain of $6,739.00 from the sale of 30 shares of common stock of [the corporation]." OPINION The disposition of this case depends upon the tax consequences of two transactions that took place on May 4, 1977: the corporation's *658 redemption of 30 shares of Marion for $18,000 and Hall's sale of 30 of his shares in the corporation to Marion or Smith for $18,000. Having taken inconsistent positions in the determined deficiencies in these consolidated cases, respondent is essentially a stakeholder and is primarily concerned that the transactions in question by uniformly treated for tax purposes by both parties. On brief, however, he urges that the redemption and sale were integral parts of a single transaction, which constituted a "constructive" redemption of 30 shares of Hall's stock by the corporation. He further argues that such constructive redemption is essentially equivalent to a dividend under section 302(b)(1). [5]Hall, on the other hand, contends that his sale of stock to Smith or Marion was independent from the redemption and that, accordingly, the profit from the sale of his 30 shares is long-term capital gain from the sale or exchange of a capital asset. Hall alternatively contends that assuming, for the sake of argument, the transactions in question constitute a constructive redemption of his stock, such constructive redemption was not essentially equivalent to a dividend and therefore, is not *659 taxable to him as a dividend. In the alternative respondent argues that we should find that the redemption of Marion's 30 shares of stock resulted in long-term capital gain taxable to the petitioners in docket No. 14642-80, if we find that the stock transactions of May 4, 1977, do not constitute a constructive redemption of 30 shares of stock from Hall. It is well settled that the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945); Minnesota Tea Co. v. Helvering,302 U.S. 609 (1938); Yamamoto v. Commissioner,73 T.C. 946 (1980), affd. in unpub. opinion 672 F.2d 924 (9th Cir. 1982). Courts have frequently treated separate steps as part of a single transaction so as to elevate substance over form. See e.g., Helvering v. Alabama Asphaltic Limestone Co.,315 U.S. 179 (1942); Kuper v. Commissioner,533 F.2d 152, 156 (5th Cir. 1976), *660 affg. on this issue 61 T.C. 624 (1974); Kimbell-Diamond Milling Co. v. Commissioner,14 T.C. 74 (1950), affd. per curiam 187 F.2d 718 (5th Cir. 1951). If the corporation's redemption of Marion's 30 shares, followed shortly thereafter by Smith or Marion's acquisition of 30 shares of Hall, were steps taken in pursuance of a prearranged plan, then the two steps must be treated as parts of a single transaction.[6] Cf. Estate of Rosenberg v. Commissioner,36 T.C. 716 (1961); Murrin v. Commissioner,24 T.C. 502, 508 (1955); Independent Oil Co. v. Commissioner,6 T.C. 194 (1946). But if, as claimed by Hall, Smith agreed to purchase Hall's shares and subsequently conceived the idea of having Marion's shares redeemed, then the two steps will not be amalgamated into a single transaction. As *661 a result of the antithetical positions of Hall and Marion, there is a definite disparity in the testimony of these witnesses. In resolving this case, we have been required to decide the factual question of whose version of the events leading to the transactions on May 4, 1977, is most realistic and convincing. As we analyze the situation, Hall was most anxious to reduce his indebtedness to FNEB. Hall apparently decided that the most practicable means of obtaining funds to reduce that indebtedness was by selling a portion of his stock in the corporation, which was controlled by him. Therefore Hall opened negotiations to sell some of his stock in the corporation to Smith and McDonald. Both Smith and McDonald were willing to help Hall by purchasing some shares. Smith, however, had insufficient cash to consummate his purchase. Hall testified to the effect that Smith and he had no discussions about the corporation redeeming Marion's stock to provide Smith with the funds to purchase Hall's stock. Since Smith was deceased at the time of trial, contradiction of Hall's testimony was ruled out. [7] We realize that *662 we may not arbitrarily disregard a taxpayer's uncontradicted and unimpeached testimony. See William v. Commissioner,28 T.C. 1000, 1001 (1957). Yet, we are not bound to accept as conclusive a taxpayer's uncontraverted, self-serving testimony when express contradiction is unlikely or impossible, if the testimony "is improbable, unreasonable, or questionable." Cf. Banks v. Commissioner,322 F.2d 530, 537 (8th Cir. 1963); Pascarelli v. Commissioner,55 T.C. 1082, 1095 (1971), affd. 485 F.2d 681 (3d Cir. 1973); Imburgia v. Commissioner,22 T.C. 1002, 1018 (1954). *663 Clearly, if the transactions in question had not transpired, only Hall would have failed to receive what he desired. It was Hall who wanted cash in exchange for his stock. Although Hall, as the majority shareholder, could have caused the corporation to redeem his shares for cash, he apparently chose to sell them to Smith so as to avoid the possibility of gain on their disposition being taxed to him as dividend income. As a result of the transactions, Hall disposed of 30 shares and received $18,000 cash. The Smiths, on the other hand, were in essentially the same position before and after the stock redemption and purchase of stock from Hall. They started out owning, actually and constructively, 130 shares and ended up, actually and constructively, with 130 shares. In short, the inescapable inference drawn from the record is, and we have found as a fact, that the Smiths participated in the transactions in question solely for the purpose of helping Hall. [8] This clearly suggests that Hall, as the corporation's controlling shareholder, caused the corporation to redeem Marion's 30 shares of stock pursuant to an understanding that the redemption proceeds would be used to purchase *664 30 shares of Hall's stock. Since Hall has failed to prove that there was no such understanding and the redemption proceeds in fact were held only momentarily by the Smiths before being turned over to Hall, we conclude that the two steps before us transpired pursuant to a prearranged plan. This Court may disregard the component steps of a prearranged plan and look to the net result. Adams v. Commissioner,69 T.C. 1040, 1048 (1978), affd. 594 F.2d 657 (8th Cir. 1979). Here the net result of the steps under examination, when considered together, was a redemption of 30 shares of the corporation's stock from Hall. *665 Hall's reliance on Holsey v. Commissioner,258 F.2d 865 (3rd Cir. 1958), revg. 28 T.C. 962 (1957), is misplaced. [9] in Holsey, the Court was required to determine the tax consequences to a shareholder of merely the redemption of another shareholder's stock. Here, in contrast, we are concerned with the tax consequences to a shareholder when a corporation redeems the stock of another shareholder, who then purchases stock from the first shareholder with the funds obtained from the corporation. Hall, citing Estate of Lukens v. Commissioner,246 F.2d 403 (3rd Cir. 1957), revg. 26 T.C. 900 (1956), maintains that "significant consequences" must exist before a redemption of stock held by one shareholder can be said to resemble a dividend distribution to another stockholder. That case too is inapposite. In Estate *666 of Lukens, the taxpayer decided to terminate his interest in a corporation, whose only other stockholders were his son and daughter. Three significant steps were taken in pursuance of the taxpayer's termination of his interest in the business: In 1946, the taxpayer gifted stock to his son and daughter; in 1948, the corporation redeemed a portion of his stock; and in 1950, he gifted his remaining stock to his son and daughter. The only issue for decision was whether the 1948 redemption of the taxpayer's stock was taxable to him as a dividend. Having decided that, in substance, the transactions on May 4, 1977, constitute a redemption of shares from Hall, we must next decide whether such redemption is essentially equivalent to a dividend. As a general rule, when property is distributed by a corporation to a shareholder with respect to the corporation's stock, the distribution is taxable as a dividend to the recipient. Sections 301(a) and (c) and 316(a). However, section 302(a) provides that if a corporation redeems its stock and section 302(b)(1), (2), (3), or (4) is applicable, then *667 the redemption shall be treated as being in part or full payment in exchange for the corporation's stock. Since stock is generally a capital asset, any gain realized on the deemed exchange will be capital gain. Section 1222. Hall urges assuming that, as we have found, in substance the transactions that took place on May 4, 1977, constitute a redemption of 30 shares of the corporation's stock from him, such redemption should be treated as a sale resulting in long-term capital gain pursuant to section 302(b)(1).
Section 302(b)(1) is applicable to a redemption if it "is not essentially equivalent to a dividend." In order to qualify under section 302(b)(1), "a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation." United States v. Davis,397 U.S. 301, 312 (1970). Furthermore, the attribution rules contained in section 318 ordinarily apply for purposes of determining whether a transaction qualifies under section 302(b)(1). United States v. Davis, supra at 305-307. Prior to the transactions on May 4, 1977, Hall *668 actually owned 545 of the 1,000 outstanding shares of the corporation and his wholly-owned corporation, Aggregate Haulers, Inc., owned 175 shares. Since Hall is deemed to own the shares of Aggregate Haulers, Inc., section 318 (a)(2)(C), a total of 720 shares, or 72 percent of the outstanding stock was actually and constructively owned by Hall. As a result of the constructive redemption of the 30 shares held by Hall, Hall owned 515 shares [10] of the 970 shares then outstanding and Aggregate Haulers, Inc., owned 175 shares. Thus, the constructive redemption reduced the percentage of shares actually and constructively owned by Hall from 72 percent to 71.1 percent ((515 + 175) / 970). Hall submits that, in measuring his postredemption stock ownership, we should also take into consideration his sale of 30 shares to McDonald, which also was consummated on May 4, 1977. Following that sale, Hall actually and constructively owned *669 660 of the 970 shares outstanding, or 68 percent of the outstanding stock. Hall advances two theories as to why the "meaningful reduction" standard has been satisfied, the thrust of both arguments being that, by reducing his voting rights to nearly 66 2/3 percent, the redemption made him far more vulnerable to losing his ability to control a merger, consolidation, or liquidation pursuant to Va. Code sec. 13.1-70 and 77 (1978). First, Hall points out that, if Smith had subsequently acquired the 30 redeemed shares from the corporation, which Smith allegedly intended to do, then Hall only would have owned, actually and constructively, 66 percent of the outstanding stock of the corporation, an insufficient percentage to effect a merger, consolidation, or liquidation, by himself, under Virginia law. Second, Hall notes that if he subsequently were to encounter financial difficulties, he would no longer be able to sell additional shares, so as to satisfy his financial obligations, and still retain control of the corporation. We find it unnecessary to rule on Hall's contention that his postredemption stock ownership should be measured after his sale of 30 shares to McDonald. Even if, *670 arguendo, we consider Hall's actual and constructive ownership interest in the corporation to have been reduced from 72 percent to 68 percent, the redemption would be taxable as a dividend because there would still be no meaningful reduction in Hall's proportionate interest. For us to consider the possibility that later events might result in the meaningful reduction requisite for capital-gain treatment, when such events are not called for by an overall financial plan existing as of the time of the redemption under examination, would be contrary to the concept of annual tax accounting. See Paparo v. Commissioner,71 T.C. 692, 704-705 (1979). Here, there is not one scintilla of evidence of any plan that would cause a further reduction in Hall's proportionate interest. [11] Rather, there is only speculation as to what may happen in the future. *671 Hall finally relies on Rev. Rul. 76-364, 1976-2 C.B. 91, in which a 4.73 percent reduction of a taxpayer's ownership interest was determined to be a meaningful reduction of the taxpayer's interest in the corporation and not to be essentially equivalent to a dividend. The situation described in that revenue ruling is readily distinguishable from the facts of the present case. The Commissioner explained that the redemption not only reduced the taxpayer's interest by 4.73 percent, but also was meaningfulinitself because it caused the taxpayer to go from a position in which he could exercise control over the corporation by acting in concert with only one other stockholder, to a position where such action was impossible. Here, in contrast, Hall remained in a position that afforded him control over the corporation following the transactions on May 4, 1977. We have previously held a reduction in interest in a corporation of nearly 10 percent not to be "meaningful" within the holding of the Davis case where a dominant shareholder was not deprived "of his ability to control the corporate activities." Fehrs Finance Co. v. Commissioner,58 T.C. 174, 185-186 (1972), *672 affd. 487 F.2d 184 (8th Cir. 1973). We hold that the deemed redemption of Hall's stock was "essentially equivalent to a dividend" within the provisions of section 302(b)(1). Decision will be entered for respondent in docket No. 10769-80.
Decision will be entered under Rule 155 in docket No. 14642-80.
Footnotes
1. The deduction for medical expenses allowed the petitioners in docket No. 14642-80 was also adjusted by respondent as a result of a $100 error made in the 1977 income tax return of Robert T. Smith and Marion W. Smith and of the determined increase in the amount of their adjusted gross income. The resolution of the above issue will permit a computation of the correct amount of the medical expense deduction.↩
2. The remaining 50 shares were owned by Larry W. Hartman.↩
3. Hall also transferred 30 shares of stock in the corporation to McDonald on May 4, 1977.↩
4. Until his retirement in 1974, Smith was employed by Sam Finley, Inc., a division of Ashland Oil and Refinery Company.↩
5. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise provided.↩
6. We note that, contrary to Hall's assertion on brief, the burden of proof as to whether a "preconceived plan" in fact existed is not on respondent. Rule 142(a), Tax Court Rules of Practice and Procedure.↩
7. While testifying on direct examination, Marion stated that Smith told her that the redemption and repurchase were Mr. Hall's idea. At trial Hall's counsel raised hearsay objections to Marion's testimony about Smith's statements to her regarding Smith and Hall's discussion. Respondent's counsel argued that Smith's statements were admissible as admissions of a party-opponent under Fed. R. Evid. 801(d)(2). A review of the record convinces us that the conversation related by Marion was inadmissible hearsay. Fed. R. Evid. 801 (d)(2)(A)↩ provides that a statement is not hearsay if it constitutes an admission by a party-opponent, i.e., "the statement is offered against a party and is his own statement, in either his individual or a representative capacity." Smith's statements to Marion are not admissions, inasmuch as they were offered not against Smith's, but against Hall's, position in the present case. Respondent has not relied on any other exception to the hearsay rule, and we have been unable to find any exception which is applicable.
8. Hall's contention that the redemption was separately conceived by Smith as part of a plan whereby, through a subsequent repurchase of Marion's redeemed shares, he could eventually increase his interest in the corporation so as to maintain and/or improve his salary and/or position with the corporation is not convincing. If Smith was truly concerned with increasing his interest in the corporation, we think that he would have either borrowed money or liquidated the aforementioned certificate of deposit with Colonial American to purchase Hall's 30 shares. Since Marion's redeemed shares could have been purchased by anyone from the corporation, the course of action followed by Smith provided him with no assurance that he could repurchase Marion's 30 redeemed shares. Moreover, even if Smith would have repurchased the redeemed stock he would have held, directly and constructively, only 160 out of 1,000 shares, or 16 percent of the outstanding stock, not a sufficient amount to exercise control over his salary and/or position.↩
9. Hall, citing Holsey v. Commissioner,258 F.2d 865↩ (3rd Cir. 1958), argues that, since he was not obligated to purchase Marion's shares, he received no direct benefit from the corporation's redemption of those shares and therefore, there was no constructive redemption of his stock.
10. Since we have considered the transfer of 30 shares to Smith or Marion in determining whether there was a redemption taxable to Hall, we have correspondingly reduced the number of shares held by Hall for the purpose of applying the attribution rules.↩
11. We express no opinion on the question of whether a meaningful reduction of a taxpayer's proportionate interest results when he loses his ability to effect fundamental corporate changes, although he retains control over day-to-day corporate affairs.See Blumstein, "When Is a Redemption 'Not Essentially Equivalent to a Dividend'?," 7 J. Corp. Tax. 99, 104-105 (1980)↩; Bailey, "How to Plan a Partial Redemption to Avoid the Proceeds Being Taxed as Dividends," 24 Tax. for Accountants 230, 233, 236 (1980).