**MERRILL LYNCH & CO., INC.,
and Subsidiaries, Petitioner,**

v.

**COMMISSIONER OF INTERNAL
REVENUE, Respondent.**

**Docket No. 03–40676–AG.**

United States Court of Appeals,
Second Circuit.

Argued: May 20, 2004.

Decided: Sept. 28, 2004.

Kenneth W. Gideon, Skadden, Arps, Slate, Meagher & Flom, LLP (Martin D. Ginsburg, of Counsel, on the brief), Washington, DC, for Petitioner.

Bridget M. Rowan, Attorney, Department of Justice (Eileen J. O'Connor, Assistant Attorney General, Richard T. Morrison, Deputy Assistant Attorney General, Richard Farber, Attorney, Department of Justice, on the brief), Washington, DC, for Respondent.

Before: MINER and POOLER, Circuit Judges, and GOLDBERG, Judge.*

* The Honorable Richard W. Goldberg, Judge of    the United States Court of International

POOLER, Circuit Judge.

Merrill Lynch & Co., Inc. & Subsidiaries ("Merrill Group") appeal from a decision of the United States Tax Court (Marvel, J.), holding that the Commissioner of Internal Revenue (the "Commissioner") correctly assessed deficiencies in Merrill Group's payment of income tax for the tax years 1987 and 1988. Merrill Group contends that a series of transactions that it undertook in order to rid itself of a subsidiary increased its basis in the subsidiary and allowed it to take a large capital loss that was used to reduce capital gains in the 1987 and 1988 tax years.[1] The Commissioner does not share Merrill Group's view of the tax consequences of these transactions.

We affirm the conclusions of the tax court on the issues it reached and remand for the court to consider an interpretation of one section of the Internal Revenue Code ("I.R.C.") that was advanced for the first time on appeal.

## BACKGROUND

"The avoidance of taxes is the only intellectual pursuit that carries any reward."

—John Maynard Keynes

### A. Merrill Lynch's Transactions

Before any of the transactions at issue in this appeal took place, Merrill Lynch & Co., Inc. ("Merrill") served as a parent corporation to a number of wholly-owned subsidiaries, including Merrill Lynch Capital Resources ("Resources"), Merrill Lynch Realty ("Realty"), Merrill Lynch Asset Management ("Management") and Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS"). Although a number of these subsidiaries held subsidiaries of their own, only those held by Resources are relevant to this appeal. Due to the parent-subsidiary relationships that existed among all of these companies, Merrill Group filed a consolidated tax return under the designation "Merrill Lynch & Co., Inc. & Subsidiaries" for each of the tax years at issue in this appeal.

Resources, the subsidiary at the center of this dispute, was a mid-market leasing business created by Merrill to facilitate the expansion of Merrill's brokerage-service business into the mid-market and small business sectors. In early 1987, Merrill's management decided that Resources had served its purpose and that it was time to sell its multi-million dollar leasing portfolio, given that leasing was outside of Merrill's core competency and that the portfolio of leases had begun to generate taxable income. Because Resources held a large number of relatively small leases, Merrill decided that in order to divest itself of Resources' leasing assets it made practical sense to sell its stock in Resources instead of trying to sell each of the leases individually. However, Resources did hold some assets that Merrill wanted to keep, and by February 17, 1987, a draft memorandum identified the assets that Resources would continue to hold at the time it was sold.

On March 13, 1987, Merrill created a project team to handle the Resources divestiture and named Theodore D. Sands chief negotiator. The apparent focus of this team was to maximize Merrill's return on this transaction, taking into account everything from the purchase-price received to the tax benefits it would generate. During the month of March, the team took the first step of organizing the creation of a multi-volume offering memoran-

Trade, sitting by designation.

1. The decision also affirmed a deficiency assessed for the 1986 tax year that was not challenged by appellants.

dum for prospective purchasers (the "March Memorandum").

On March 30, 1987, Resources sold its stock in five of its subsidiaries to Realty for $53,972,607 and the stock in another of its subsidiaries to Management for $160,000,000. On April 3, 1987, Resources sold all of its stock in a final subsidiary to MLPFS for $119,819,690.[2] As the tax court did, we refer to the subsidiaries Resources sold as the Issuing Corporations and to the three transactions as the Cross–Chain Sales. Upon completing the Cross–Chain Sales, Resources had transferred all of the assets Merrill wished to keep to its sibling subsidiaries. Resources was now ready to be sold.

Meanwhile, by March 4, 1987, Merrill had identified ninety-three potential buyers for Resources and was gauging their interest in the transaction. Neither GATX Leasing Corporation ("GATX") nor BCE Development, Inc. ("BCE"), the companies that eventually purchased Resources, were referred to by name at that time. However, on March 23, 1987, a copy of the March Memorandum was sent to GATX (but not BCE) along with a confidentiality agreement. Nevertheless, no negotiations took place between Merrill and GATX until the confidentiality agreement was executed and returned, which had not yet happened as of April 2, 1987, several days after the first of the Cross–Chain Sales had been conducted and one day before they were to be completed. Eventually, five or six companies, including GATX (with BCE as a partner), were interested enough in Resources to submit bids, which were received on April 21, 1997.

On April 23, 1987, Merrill management presented the potential sale of Resources and its probable tax consequences to the Merrill board. While the definitive buyer had not been established, Merrill's CFO identified GATX/BCE as the likely purchaser, based on the initial bids. This presentation described the Cross–Chain Sales as a step taken in anticipation of the future sale of Resources in order to maximize Merrill's tax benefits. After the board meeting, Merrill conducted another round of bidding and GATX/BCE was left as the only potential purchaser. For an additional two months, Merrill negotiated exclusively with GATX/BCE, during which time due diligence was conducted. Eventually, on June 25, 1987, the parties executed a purchase agreement, whereby GATX/BCE agreed to buy Resources for $57,363,817 (down from their $66 million final bid due to concerns raised by the results of the due diligence).

## B. The Tax Treatment of the Transactions

In calculating its 1987 tax liability, Merrill took advantage of the consolidated return regulations that were in place at the time to claim a long-term capital loss from the sale of Resources. Its ability to take this loss was governed by the rule set forth in *Woods Investment Co. v. Commissioner*, 85 T.C. 274, 1985 WL 15380 (1985), *acq.* 1986–2 C.B. 1, in which the tax court concluded that basis adjustments in subsidiaries are to be made in accordance with changes in earnings and profits, rather than taxable income or loss. 85 T.C. at 281. The Commissioner did not challenge Merrill's position on this rule. However, Merrill went on to conclude that the Cross–Chain Sales increased its basis in Resources pursuant to Treas. Reg. §§ 1.1502–33(c)(1), 1.1502–32(a), (b)(1)(i).

---

**2.** In addition, Resources distributed some other assets as dividends in three transactions

that the Commissioner has not challenged.

This increase in basis is the crux of the dispute between the parties because it allowed Merrill to increase its tax loss on the sale and use that loss to offset capital gains that were otherwise taxable.

Merrill determined that it could increase its basis in Resources by classifying the Cross–Chain Sales as dividends, based on an interpretation of the interaction between I.R.C. §§ 304, 302, 301 and 318. Dividend treatment for the Cross–Chain Sales is important because it allows the sums received from the purchasing subsidiaries to be treated as earnings, thus triggering an increase in Merrill's basis in Resources. Section 304 provides that sales of stock between companies that are owned by the same individual (or in this case Merrill) are to be treated for tax purposes as a distribution in redemption of the stock of the corporation acquiring the stock. I.R.C. § 304(a). In other words, the way the transaction actually took place is ignored and the transaction is instead viewed as a stock swap between the buying and selling companies, where the stock of the buying company is hypothetically redeemed (to take into account the fact that it was never actually transferred in the first place). Section 301, through an internal reference to I.R.C. § 316, sets forth the default tax rule that distributions of property (including distributions of to-be-redeemed stock) are to be treated as dividends and explains how such dividends are to be accounted for. *See* I.R.C. §§ 301(c), 316. Section 302 sets forth an exception to this default rule that only applies to certain distributions in redemption of stock. I.R.C. § 302(a). If a distribution in redemption falls within the ambit of any one of four scenarios, the redemp-

tion is treated as an exchange and thus does not receive dividend treatment. I.R.C. § 302(b). The scenario that could apply to Merrill Group's transactions is a "complete redemption of all of the stock of the corporation owned by the shareholders," which is essentially a test for whether the selling company has completely terminated its interest in the stock of the company being sold. I.R.C. § 302(b)(3). Resources' sale of the Issuing Corporations might fall under this provision due to the operation of Section 318, which sets forth the constructive ownership of stock provision that applies to this subchapter of the Internal Revenue Code. I.R.C. § 318(a). This rule of constructive ownership operates so that stock owned by one of the subsidiaries of a parent company may also be interpreted as being owned by the other subsidiaries of that same parent company.[3] *See id.* This suggests that when Resources sold the Issuing Corporations it retained an interest in them through its parent/subsidiary relationship with Merrill and its subsidiaries. Therefore, the complete redemption scenario of Section 302(b)(3) would only be fulfilled if the Cross–Chain Sales and the sale of the Resources were considered together ("integrated") so that only the combined transaction would be scrutinized under Section 302(b)(3), because only Merrill's sale of Resources terminated Resources' interest in the Issuing Corporations.

Merrill's view was that the Cross–Chain Sales did not meet the requirements of Section 302(b)(3) because Resources' interest in the Issuing Corporations was not completely terminated by the Cross–Chain Sales. Merrill reached this result by analyzing the transaction at the time of

---

**3.** This interpretation of the effect of Section 318 is not apparent to us from its language. However, both parties argue that this is how the statute operates, so we will proceed under this understanding. Based on the representations of the parties, any challenge to this interpretation has been waived.

the Cross–Chain Sales and concluding that at that time, Resources was still a cosubsidiary of the purchasers of the Issuing Corporations and thus still retained a constructive interest in the Issuing Corporations via Section 318's constructive ownership provisions. Therefore, Merrill concluded that the default rule set forth in Section 301 applied, allowing it to classify the Cross–Chain Sales as dividends and the purchase prices received as earnings and profits of Resources. *See* Treas. Reg. § 1.1502–33(c)(1). This increase in undistributed profits allowed Merrill to increase its basis in Resources. *See* Treas. Reg. § 1.1502–32(a), (b)(1)(i). By increasing its basis in Resources, Merrill turned the sale of the subsidiary into a large capital loss that was then used to offset capital gains during two tax years.

The Commissioner rejected Merrill's basis adjustments and entered deficiencies for 1987 and 1988. The Commissioner took a different view of how I.R.C. §§ 304, 302, 301 and 318 applied to the transactions into which Merrill Group entered. While Merrill Group had determined that Section 302—the provision that prevents dividend treatment—did .not apply to the Cross–Chain Sales, the Commissioner concluded that it did apply. The Commissioner reached this result because instead of looking to whether Resources had terminated its interest in the Issuing Corporations at the time the Cross–Chain Sales were conducted, he instead performed this analysis looking at the time Resources was sold,[4] after deciding that it was proper to integrate the Cross–Chain Sales with the sale of Resources. The Commissioner therefore concluded that Section 302 did apply to the Cross–Chain Sales and thus that Merrill Group could not treat the

Cross–Chain Sales as dividends and thereby increase its basis in Resources. This led the Commissioner to conclude that Merrill had improperly avoided more than $25 million in taxes in 1987 and 1988.

Merrill Group challenged this determination before the United States Tax Court. The tax court sided with the Commissioner after a review of its prior cases, in particular *Niedermeyer v. Commissioner,* 62 T.C. 280, 1974 WL 2738 (1974), *aff'd,* 535 F.2d 500 (9th Cir.1976), led it to decide that a series of transactions should be integrated for Section 302(b) purposes where there was a "firm and fixed plan" to perform the second transaction at the time the first transaction was executed. *Merrill Lynch & Co. v. Comm'r,* 120 T.C. 12, 51–52, 2003 WL 124159 (2003). The tax court went on to conclude that the Cross–Chain Sales and the later sale of Resources were part and parcel in a firm and fixed plan. *Id.* at 60. In its decision, the tax court reduced the deficiency assessed by the Commissioner for 1987 and 1988 to $19,683,130. Merrill Group now appeals.

### DISCUSSION

■ We review the legal conclusions of the tax court de novo and its factual findings under the clearly erroneous standard. *Bausch & Lomb Inc. v. Comm'r,* 933 F.2d 1084, 1088 (2d Cir.1991). "Mixed questions of law and fact, entailing the application of a legal standard to a given factual pattern, are [also] reviewed under the clearly erroneous standard." *Id.* (internal quotations and citation omitted).

### A. Review of the Tax Court's Integration Analysis

While the statutory backdrop to this case is daunting, it did not form the heart

---

4. As we discuss below, when the analysis is performed is crucial in determining whether the integration is proper.

of the dispute before the tax court. Rather, the parties were in agreement that if the Cross–Chain Sales could be integrated with the sale of Resources for the purpose of conducting the Section 302(b)(3) test, the Commissioner's deficiency ruling was accurate; and that if they could not be integrated, the deficiency ruling was invalid.

Our court has yet to adopt a test for the integration of transactions in the Section 302(b)(3) context. As a result, the tax court looked to its own cases and to those of other Circuits for an appropriate test. *See Merrill Lynch & Co.*, 120 T.C. at 43–53. These cases uniformly relied on the "firm and fixed plan" test, without providing useful analysis explaining how it was to be applied under circumstances similar to those presented in this case. *See id.* While the parties are at odds over how the firm and fixed plan test is to be applied, neither suggests that we should craft or adopt a different test.

There is no question that any test we adopt must allow certain transactions to be integrated for the purposes of I.R.C. § 302(b)(3). Otherwise, that provision would be effectively read out of the tax code, as taxpayers could avoid it simply by conducting transactions in multiple steps, designed to delay a total termination of interest in a company. Nevertheless, we believe that a test targeted strictly at the intent of the taxpayer would be overly subjective and unmanageable. The initial appeal of the firm and fixed plan test is that it allows for the integration of the majority of transactions that are structured to avoid Section 302(b)(3), while providing the court with a relatively objective measure to consider in reaching its decision. In addition, this test has enjoyed a long history in the tax court, allowing us to observe how it has evolved over time and giving us a better understanding of its

scope. Finally, we find it significant that neither party proposes an alternative test for our consideration. For these reasons, we adopt the firm and fixed plan test for the purpose of determining whether two transactions should be integrated when they are considered in the Section 302(b)(3) context.

While the parties both adopt the firm and fixed plan test as the framework for their respective arguments, they disagree over how the test is to be applied in this case. Not surprisingly, there is little relevant precedent applying the firm and fixed plan test. Merrill Group contends that the court must evaluate the plan to sell Resources at the time the Cross–Chain Sales were executed. It argues that Merrill's plan to sell Resources was not firm and fixed because it had not yet settled on a final buyer for Resources at the time of the Cross–Chain Sales. Thus, Merrill Group challenges the result reached by the tax court, suggesting that the court misapplied the firm and fixed plan test by resting its ruling on intent alone. The Commissioner does not challenge Merrill Group's assertion that the plan's status must be evaluated at the time of the Cross–Chain Sales. However, he argues that Merrill's failure to identify a final buyer for Resources at that time does not prevent the plan from being firm and fixed. The Commissioner suggests that the tax court properly looked for objective evidence of an overall plan by Merrill to terminate its interest in Resources, and that this evidence sufficiently supported a finding that the Cross–Chain Sales were an integrated step in Merrill's overall plan to sell Resources. Therefore, he concludes that the tax court properly found that a firm and fixed plan existed, even though all of its details were not finalized at the time of the Cross–Chain Sales.

In approaching this problem, we take some measure of guidance from the decisions of other courts that have had the opportunity to address it. *See Zenz v. Quinlivan*, 213 F.2d 914, 916 (6th Cir. 1954) (holding that "a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits" and applying a test that did not focus on intent, to determine whether the Commissioner properly assessed a deficiency); *Monson v. Comm'r*, 79 T.C. 827, 837, 1982 WL 11184 (1982) (holding that a firm and fixed plan existed to conduct a series of transactions that resulted in the taxpayer's interest in a company being fully terminated where the minutes of a board of directors meeting described the redemption and the subsequent sale of taxpayer's remaining stock to a third party as steps in the sale); *Roebling v. Comm'r*, 77 T.C. 30, 54–55, 1981 WL 11263 (1981) (holding that a gradual redemption of the taxpayer's shares in a company could be integrated as a series of steps in a firm and fixed plan even though there was no binding agreement between the taxpayer and the bank that was redeeming the shares); *Bleily & Collishaw, Inc. v. Comm'r*, 72 T.C. 751, 1979 WL 3746 (1979), *aff'd*, 647 F.2d 169 (9th Cir.1981); *Paparo v. Comm'r*, 71 T.C. 692, 1979 WL 3754 (1979); *Benjamin v. Comm'r*, 66 T.C. 1084, 1976 WL 3648 (1976), *aff'd* 592 F.2d 1259 (5th Cir.1979) (holding that a plan of redemption that was alleged to terminate the taxpayer's ownership interest in a company was not properly integrated for purposes of Section 302 where there was minimal evidence to support the existence of such a plan, much less any evidence explaining when or how it was to be conducted); *Niedermeyer v. Comm'r*, 62 T.C. 280, 1974 WL 2738 (1974), *aff'd* 535 F.2d 500 (9th Cir.1976). We will focus, however, on the two cases that we find most persuasive in resolving the dispute between the parties, *Neidermeyer* and *Bleily*, and on the case upon which Merrill Group relies most heavily, *Paparo*.

*Niedermeyer* was the first case to identify the firm and fixed plan test by name. In that case, the taxpayers owned common and preferred stock in American Timber & Trading Co., Inc. ("AT & T"). In an attempt to divest themselves of their AT & T holdings, the taxpayers sold all of their common stock to Lents Industries, Inc., a company that was principally owned by their children. *Niedermeyer*, 62 T.C. at 282–83. Approximately three months later, the taxpayers contributed their AT & T preferred stock to the Niedermeyer Foundation, a tax-exempt organization. *Id.* at 283. Searching for tax benefits, the taxpayers argued that their two transactions should be integrated for Section 302(b)(3) purposes. The tax court began by noting that "[w]here there is a plan which is comprised of several steps, one involving the redemption of stock that results in a complete termination of the taxpayer's interest in a corporation, section 302(b)(3) may apply." *Id.* at 291 (citation omitted). However, the tax court set a limit on this position, holding that "the redemption must occur as part of a plan which is firm and fixed and in which the steps are clearly integrated." *Id.* (citation omitted). The tax court went on to find that the taxpayers had failed to prove that such a plan existed, as there was no written record of it and the only evidence presented by the taxpayers to prove that a plan existed was their own self-serving testimony. *Id.* In addition, the court noted that if such a plan did indeed exist, it was not binding on the taxpayers, who could have changed their minds and decided not to donate their stock. *Id.* at 291–92. However, the court stopped short of requiring that a plan be in writing, absolute-

ly binding, and communicated to others in order to be firm and fixed. Instead, the court suggested that these were all factors to be assessed when reviewing a plan and held that because none of them were present, the Neidermeyer's plan was not firm and fixed. *Id.* at 292.

■ Merrill Group cites the language in *Niedermeyer* suggesting that the plan must be binding on the taxpayer to support Merrill Group's position that the plan to sell Resources was not firm and fixed because Merrill Group did not have a buyer who was locked in. However, this ignores the subsequent language of the opinion, which explains that whether a plan is absolutely binding is merely one factor in the firm and fixed plan analysis. *Id.* Indeed, the other factors identified in *Niedermeyer* tend to suggest that a firm and fixed plan was in place. First, the Commissioner has identified ample written documentation of Merrill Group's plan, supporting the tax court's conclusion that Merrill Group knew at the time that the Cross–Chain Sales were conducted that it would also be selling Resources. The most convincing document is the printout of the slides used in the presentation to Merrill's board on April 23, 1997, which explains that the Cross–Chain Sales were conducted in order to increase Merrill's return on its sale of Resources. Concededly, this printout is dated after the Cross–Chain Sales were made, calling into question its relevance to a review that is theoretically conducted at the time the Cross–Chain Sales were completed. Nevertheless, the relevance of the board presentation is bolstered by the offering materials that were distributed to potential purchasers before the Cross–Chain Sales were completed and did not include the assets transferred in the Cross–Chain Sales, demonstrating that the plan had been in place at that time. In addition,

these offering materials could arguably satisfy the factor requiring communication of the plan to third parties. After all, they made clear that a number of assets that Resources currently held would no longer be there at the time of its sale. Finally, while the plan was not binding in a legal sense, it certainly was binding economically. Because the Cross–Chain Sales took place between the members of Merrill Group, they did not create any economic benefit to Merrill Group as a whole absent the subsequent sale of Resources and probably gave rise to a significant level of transaction costs. Without the Resources sale, there would appear to be no economically beneficial purpose to the rearrangement of assets between Merrill's subsidiaries.

*Bleily* is the second case that we find useful. In that case, the majority shareholder of a company wanted to buy out the minority shareholder. 72 T.C. at 753. However, this transaction had to take place over time because the majority shareholder could not afford to purchase all of the taxpayer's shares at one time. *Id.* The tax court held that the redemptions met the requirements of Section 302(b)(3) because they represented the execution of a firm and fixed plan to eliminate the minority stockholder from the corporation. *Id.* at 756. The court further noted that "a plan need not be in writing, absolutely binding, or communicated to others to be fixed and firm although these factors all tend to indicate that such is the case." *Id.* As a result, the court used the facts available to it, which were relatively meager, to support its conclusion that an adequate plan existed.

The situation with which we are presented bears a very close resemblance to that presented in *Bleily*, in that Merrill did not know exactly when its divestiture of Resources was going to take place and did

not have a binding agreement to sell. However, these deficiencies do not preclude the tax court from using the evidence available to it to determine whether sufficient facts support the conclusion that a plan existed. *Id.* Therefore, given that the tax court was presented with a significant amount of both documentary and circumstantial evidence that was available at the time of the Cross–Chain Sales and that suggested there was a plan in place for the sale of Resources, *see supra* at 13–14, we conclude that the tax court correctly determined that a firm and fixed plan to sell Resources existed before the Cross–Chain Sales were executed. Furthermore, the fact that the planned sale of Resources took place cannot be entirely ignored. While the eventual sale is certainly not adequate alone to support a conclusion that a firm and fixed plan was in place, it does tend to bolster the evidence that existed at the time the Cross–Chain Sales were made. Although we previously chose not to adopt a test that focuses on the intent of the taxpayer, using subjective elements of this test to confirm the results of an objective test does not present the same concerns as using an entirely subjective test. *See supra* at 9–10. This final factor merely allows us to be more confident in our conclusion that the tax court correctly determined that a firm and fixed plan for the sale of Resources existed at the time the Cross–Chain Sales were made.

Merrill Group identifies *Paparo* as the case best supporting its position. In that case, the taxpayers were shareholders of two women's apparel manufacturers ("Nashville and Jasper"), and House of Ronnie, Inc. ("HR"), a design and marketing company that distributed the clothing made by Nashville and Jasper. *Paparo*, 71 T.C. at 694–95. In order to improve their sales figures, the taxpayers decided to acquire another women's apparel manufacturer ("Denise Lingerie"). *Id.* at 696. They wanted to structure the transaction as a stock swap, but Denise Lingerie's shareholders would not consider accepting stock in a privately held corporation. *Id.* Thus, the taxpayers began to explore taking HR public. *Id.* at 697. In order to facilitate this process, in 1970 the taxpayers and another Nashville and Jasper shareholder sold all of their stock in those companies to HR under the understanding that the purchase price would be paid from the proceeds of one or more public offerings of HR's stock. *Id.* On March 30, 1970, the first public offering of HR's stock was made, and a portion of the proceeds was used to pay off the Nashville and Jasper shareholders. *Id.* at 698. This transaction was conducted through an underwriter. On October 30, 1970, HR entered into an agreement with Denise Lingerie's shareholders to acquire all of Denise Lingerie's outstanding stock in exchange for HR's stock. *Id.* at 699. Finally, on April 20, 1972, a second public offering of HR's stock was made, again through an underwriter. A portion of the proceeds from this sale was used to pay the remainder of the purchase price owed to the Nashville and Jasper shareholders. *Id.* at 700–01.

The taxpayers argued that the redemptions qualified as sales and not dividends under Section 302(a) because they met the requirements of either Section 302(b)(1) or (2). *Id.* at 703. They suggested that the 1970 redemption was the first step and the 1972 public offering was the last step in an overall plan to redeem their interest in Nashville and Jasper and thus the redemption should not receive dividend treatment. *Id.* The tax court rejected the taxpayers' argument, concluding that the record did not contain any compelling evidence of an overall financial plan covering both the first and the second public offerings. *Id.*

474

at 704. This conclusion was reached because no formal written plan for the funding of the redemption through subsequent public offerings of HR's stock existed; no corporate minutes were introduced to support this contention; funding the redemption through subsequent public offerings of HR's stock was beyond the control of the taxpayers; and there was no evidence of an agreement to make another public offering. *Id.* at 705.

Merrill suggests that this case stands for the rule that intent alone is insufficient to integrate transactions that occur on different dates. *See id.* at 705. In addition, Merrill draws our attention to the following language from the opinion: "[w]hile [the Paparos] apparently intended that subsequent public offerings be made in futuro, there was no promise to sell any particular amount of stock between the underwriter and [the Paparos] at any particular price." *Id.* Taken out of context, this language does suggest that for a plan to exist, there must be a deal with another identified entity in place at the time of the first transaction. However, because the underwriter was a central figure in the transactions performed by the Paparos, having arguably more control over the transactions than the Paparos did, its lack of awareness of the Paparos' plan effectively proved that they had no plan in place. Thus, the lack of evidence surrounding the Paparos' understanding with the underwriter was affirmative evidence that the Paparos had no firm and fixed plan. Therefore, we understand this case to set forth a rule that self-serving testimony on intent will not be sufficient to support a conclusion that a firm and fixed plan existed for Section 302 purposes where circumstantial evidence exists to suggest that no plan was in place. In the case before us, Merrill Group's claim that it had no firm and fixed plan to sell Resources at the time of the Cross–Chain

Sales, despite the existence of significant amounts of documentary evidence that suggests otherwise, is supported by self-serving testimony. Therefore, the analysis set forth in *Paparo* does not alter our view that the tax court correctly concluded based on the objective evidence before it that Merrill had a firm and fixed plan to sell Resources at the time the Cross–Chain Sales were executed.

**B. Review of the Tax Court's Factual Findings**

Merrill Group takes issue with a number of the tax court's factual findings. Many of these challenges are meritless, particularly those attacking the tax court's finding that the presentation to Merrill's board was evidence of a plan to make the Cross–Chain Sales and then sell Resources, which is corroborated by documents dated before the Cross–Chain Sales. However, Merrill is correct that the tax court clearly erred in finding that GATX/BCE had submitted a "cash purchase price" and had been allowed to conduct due diligence before the Cross–Chain Sales took place, and that Merrill's board authorized the sale of Resources to GATX/BCE at the April 23, 1987 meeting. Nevertheless, these errors pertain to facts that are immaterial to our analysis. Therefore, they do not prevent us from affirming the decision of the tax court.

**C. Merrill Group's Statutory Challenge**

For the first time on appeal, Merrill Group makes the alternative argument that the Cross–Chain Sales and the sale of Resources did not terminate its interest in the Issuing Corporations within the meaning of Section 302(b)(3). This argument is premised on an apparently first impression interpretation of the interaction of Section 318's constructive ownership rule with Section 302. Below, the understanding of the

tax court and the parties was that when determining whether the interest in the Issuing Corporations was terminated, the party whose ownership was at issue was Resources. Now, Merrill Group contends that the proper way to perform this analysis is by looking at Merrill's ownership of the Issuing Corporations, which, because of Section 318's constructive ownership provision, remained intact after both the Cross–Chain Sales and the Sale of Resources due to its parent-subsidiary relationships with the purchasers of the Issuing Corporations. Therefore, Section 302(b) would not be triggered and the Cross–Chain Sales would have been properly classified as dividends.

In general, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). "That rule, however, is one of prudence and not appellate jurisdiction. We retain broad discretion to consider issues not raised initially in the District Court." *Lo Duca v. United States,* 93 F.3d 1100, 1104 (2d Cir.1996), *corrected by* 1996 U.S.App. LEXIS 28746 (Nov. 8, 1996). "We are more likely to exercise our discretion (1) where consideration of the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding." *Baker v. Dorfman,* 239 F.3d 415, 420 (2d Cir.2000) (internal quotations omitted). While we are unable to conclude at this stage that Merrill Group is in danger of suffering manifest injustice, the issue is purely legal. We therefore choose to consider Merrill Group's argument. However, because this argument is purely statutory in nature and falls squarely within the expertise of the tax court, we choose not to reach the merits at this stage and instead remand this issue to the tax court to con-

sider Merrill Group's argument in the first instance.

## CONCLUSION

We adopt the firm and fixed plan test as the appropriate method for determining whether two transactions conducted at different times may be integrated for the purposes of I.R.C. § 302(b)(3). In applying that test to the facts of this case, we conclude that the tax court did not err in holding that the evidence with which it was presented supported the conclusion that Merrill had a firm and fixed plan to sell Resources at the time the Cross–Chain Sales were executed. However, we refrain from considering Merrill Group's second argument, raised for the first time on appeal, and remand it to the tax court. We therefore affirm in part the decision of the tax court and remand for further proceedings consistent with this opinion.