File Name: 06a0760n.06

Filed: October 12, 2006NOT RECOMMENDED FOR
FULL-TEXT PUBLICATION

No:05-2212

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JOEL TRACY,
     *Plaintiff - Appellant*

                                   On Appeal from the United States
                                   District Court for the Eastern District of
                                   Michigan

        v.

PHARMACIA & UPJOHN ABSENCE PAYMENT PLAN,
PRUDENTIAL INSURANCE COMPANY OF AMERICA,
PHARMACIA AND UPJOHN COMPANY, PFIZER, INC.,
AND AETNA LIFE INSURANCE COMPANY
     *Defendants - Appellees*

_____/


    **BEFORE: KENNEDY, DAUGHTREY, Circuit Judges; and ADAMS, District
Judge.**[*]

    **KENNEDY, Circuit Judge.** Plaintiff Joel Tracy appeals the district court's decision upholding the finding by the Employee Retirement Income Security Act (ERISA) Plan Administrator[1] that Mr. Tracy is not entitled to permanent long-term disability payments. On appeal, Tracy argues that he has demonstrated that he is unable to be gainfully employed because of his

---

    [*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio sitting by designation.

    [1]Tracy's claim was handled by an insurance company hired by the Plan. While Prudential Insurance Company of America was the original disability case manager, that responsibility was transferred to Aetna Life Insurance Company effective January 1, 2002. JA at 310.

disability.  For the reasons that follow, we **AFFIRM** the district court's finding that Tracy is not entitled to continued long-term disability payments under the terms of the Pharmacia & Upjohn Absence Payment Plan.

## BACKGROUND

On April 23, 1989, Plaintiff Joel Tracy ("Plaintiff" or "Tracy") was hired by Pharmacia & Upjohn (now Pfizer) ("Upjohn") as a planning manager.  Tracy eventually became a Market Intelligence Planning Manager.

### A. Leave of Absence

In April of 1996, Tracy requested leave under the Family and Medical Leave Act ("FMLA") for depression and idiopathic hypersomnolence.  He submitted a letter from Dr. Michael Fusillo, a psychiatrist, who found that Tracy was suffering from depression and hypersomnia (excessive daytime sleepiness and/or prolonged nighttime sleep).  Dr. Fusillo reported that Tracy had been treated for depression and hypersomnia for a number of years and he noted that Tracy had sought help from the University of Michigan Sleep Disorder Center.  Dr. Fusillo treated Tracy with Ritalin, which eventually lost its effect.  He then treated Tracy with Dexedrine, which also began to lose its effect.  Dr. Fusillo recommended that Tracy take a month's leave of absence, during which time Dr. Fusillo would try altering the medication regime and Tracy could try to develop a regular sleep schedule.  Dr. Fusillo recommended that this period be followed by a return to work at a part-time status: 20 hours a week with some accommodations for his sleep disability.  Dr. Fusillo explained, "That is, if he could have access to a bed so that he could nap, he then would be able to plan a schedule with sleep and work."  J.A. at 146.  He wrote further, "Of significance is the fact that work

2

that bores him tends to contribute to the hypersomnia and work that he finds stimulating, tends to help it." *Id.* at 147.

Dale Peerbolte, a physician at Upjohn, reviewed Dr. Fusillo's letter and approved Tracy's FMLA certification. Tracy took medical leave from April 17, 1996 to May 17, 1996, followed by intermittent leave through June 1, 1996.

### B. Initial Disability Determination

Tracy returned to work in June, but he was unable to work for more than 20 to 30 hours a week. On November 19, 1996, Tracy left his job at Upjohn and requested disability status. Under the Pharmacia & Upjohn Absence Payment Plan ("Plan") a participant is entitled to initial long-term disability ("LTD") benefits if he is "permanently unable to be gainfully employed *at Upjohn*." J.A. at 428 (emphasis added).

While Upjohn reviewed his disability status, Tracy proposed that he could continue working as a planning manager if the company provided him with certain accommodations including: a home office or facilities at work to allow rest when he gets tired, flexible hours, and secretarial or technical support. Tracy's supervisor found that Tracy was limited to 20 hours of work a week and, because the position was a full-time position, Tracy was incapable of performing his job because of his impairment. J.A. at 691. On December 13, 1996, the Disability Review Committee determined Tracy met the standard for an initial term of disability benefits through December 31, 1999.

While receiving initial LTD benefits, on January 22, 1999, Tracy consulted with Dr. Richard Munson of the Sleep Disorders Center at Evanston Hospital. Dr. Munson completed an attending physician's report and attached a letter, which stated that "[i]n order to improve his daytime functioning, and to prevent possible injury due to falling asleep while driving, he should maintain

a regular work-sleep schedule.  This should include a consistent starting and ending time to his workday, as well as a normal eight-hour shift without overtime."  J.A. at 190.

Tracy did in fact work during the first three years he was on disability leave with Upjohn.  It appears from the report of a Dr. Richard Hurlburt, Ph.D., (dated 4/1/00) and other documents in the record (J.A. at 233, 386), that Tracy worked at Searle as Marketing Research Manager for one year during 1998-1999 and that he notified Searle that he was on disability.  Tracy stated in a resume he submitted to Searle that, prior to Searle, he worked from 1997-1998 at Westwood Squib as a manager.  He also told the claim investigator that he was eventually let go by Searle because he had been working an average of eleven hours a day and it did not have an eight-hour position.  J.A. at 386.  No other information is available in the record concerning either of these jobs.  There is no other information about job attempts.

### C. Permanent Disability Determination

By November 19, 1999, Prudential Insurance Company ("Prudential") had contacted Tracy, identified itself as a claims service provider, and informed him that his continued eligibility to receive disability payments would be evaluated.  After the initial three-year term of LTD benefits, Tracy's eligibility to receive continued LTD benefits was governed by a different standard: a participant must now be "unable to be gainfully employed *anywhere*."  J.A. at 428 (emphasis added).  This determination is "based on the existence or non-existence of a qualifying disability and will not depend on the availability of actual employment."  J.A. at 428.

Prudential considered the information that Tracy submitted and other information in his file and notified him on January 11, 2000, that he was not eligible to receive continued disability benefits under the Plan.  The letter noted the difference in the standard for initial LTD benefits limited to

three years, which he had been receiving, and continuing LTD benefits he was now claiming and that Tracy could not show he was "unable to perform any work anywhere." J.A. at 201. Prudential did extend his benefits through February 29, 2000, and offered him job placement assistance.

Tracy met with Barbara Lemke, a vocational consultant with Prudential, in February 2000 for a vocational evaluation. She advised Tracy that by using his "current skills, abilities, and education" he could be employable in the field of market research consulting. J.A. at 209. Tracy informed Lemke that he had been "working the stock market at home" since his termination from his last job in May 1999. J.A. at 219. He asked that he be granted $3,000 to $5,000 to pay for a class in investment training and he expressed confidence that he could support himself by day trading from his home. He explained that at home he could work eight hours a day and take naps when required. Prudential denied his request for retraining benefits, finding that he was employable without further retraining. J.A. at 209.

On February 24, Lemke mailed Tracy a letter indicating that she had left him several phone messages that had not been returned. She also indicated that she was still available to provide job placement assistance if he was interested. A week after mailing the letter, and with authorization from Prudential, Lemke closed Tracy's file.

On February 25, 2000, Tracy appealed the denial of continued LTD benefits to the Administrative Committee of the Pharmacia Plan. He argued that Dr. Munson's letter was not intended to support a disability determination. He encouraged the Committee to disregard that letter as it was intended for Tracy to give to potential employers and did not mention the naps that Tracy needed each day. Further, he contended that the letter was a "boiler plate" statement not specific to

5

him.[2] Tracy also submitted test results from April 1, 2000 from Dr. Hurlbut, a psychologist (as noted above). Dr. Hurlbut concluded that Tracy suffered from schizoaffective disorder with anxiety and depression and probable somatization (numerous physical symptoms over many years which cannot be fully explained by medical diagnoses), idiopathic hypersomnolence, and arthritis in his feet and chest. Dr. Hurlbut indicated that Tracy needed two naps a day of approximately 45 minutes in length and that he woke up unable to move approximately 15 to 20 times per year. Dr. Hurlbut's report did not express a conclusion on Tracy's ability to work.

In support of his appeal, Tracy also submitted responses by Dr. Bahri Gungor, M.D., a neurologist, to a questionnaire regarding his ability to work (dated 9/26/01). Dr. Gungor explained that "[i]n general, [Tracy] takes two naps a day. The first one up to one hour in the morning between 11 a.m. and 1 p.m. He takes the second nap between 3 p.m. and 6 p.m. This lasts for two hours." J.A. at 266. He also stated that Tracy's reaching, handling, fingering, feeling, and pushing/pulling were affected by his impairment as he suffers from "narcolepsy and catalepsy." J.A. at 266. Dr. Gungor circled "no" in response to whether Tracy can "work in a sustained work setting, eight hours per day, forty hours per week." J.A. at 271. In response to written follow up questions from Tracy's attorney, Dr. Gungor wrote that Tracy was limited to walking or sitting two hours each day, slept 12 to 14 hours daily, and would need accommodations for up to four hours per day for his naps. J.A. at 276-277.

---

[2] While plaintiff asserts that Dr. Munson's letter of January 22, 1999 (J.A. at 174) was to help him secure employment, Tracy's letter to Dr. Munson that resulted in the letter sought to have him complete a form for the permanent benefits he seeks here and was written after his employment at Westwood Squib and Searle were obtained. There is no evidence in the record of any effort to obtain employment after that date. Tracy's letter also mentions that he is moving to Wisconsin. The form completed by Dr. Munson shows he was the attending physician in 1998-1999 and prescribed the medications Tracy was taking.

The opinion of the Administrative Law Judge (ASA) in Tracy's Social Security Administration (SSA) proceeding (discussed *infra*) describes Dr. Gungor, in passing and without explanation, as a "treating specialist." J.A. at 303. However, neither of the documents from Dr. Gungor in the record, J.A. at 265, *et seq.*, indicate his status themselves. Plaintiff counsel's correspondence with Dr. Gungor indicates only an examining, and not ongoing, relationship. For example, plaintiff's counsel requested that Dr. Gungor clarify his conclusions based on Tracy's medical records and Dr. Gungor's examination. Counsel did not, nor did Dr. Gungor in his responses, make any reference to or recommendations of treatment. The questions and responses do not reference any ongoing relationship. No other examination was referenced, nor any change in condition noted.[3] From this limited record we cannot determine that Dr. Gungor was a treating specialist and not merely an examining one.

### D. Social Security Benefits Application

Tracy applied for Social Security Disability Benefits and on March 5, 2002, the Social Security Administration ("SSA"), based on Dr. Gungor's report, determined that Tracy had been totally and permanently disabled due to his depression and hypersomnia since March 31, 1999 (Tracy applied for these benefits in December 1999).[4] J.A. at 285. On his application for Social Security benefits, he indicated that he was day trading stocks 4-5 hours every day. However, he also indicated to a Dr.

---

[3]Tracy stated in his Brief in Response to Defendant's Motion to Affirm the Administrator's Decision, submitted to the district court below, that Dr. Gungor was an examiner appointed by the SSA. JA at 771. Why the ALJ would then refer to Dr. Gungor as a "treating specialist" is unexplained. Regardless, his admission further supports our conclusion that Dr. Gungor's report was not entitled to any deference as a treating physician's.

[4]We note that in the SSA proceeding, the burden was on the government to prove Tracy's ability to work. In this case, as we have previously noted, the burden shifts to Tracy.

7

O'Malley (report 4/14/2000, J.A. 373) that he was trading 6-8 hours a daily. Whether his efforts in the stock market were profitable is unknown. J.A. at 385 (summary of Tracy's file, including interviews with Tracy). The record is silent as to whether plaintiff submitted Dr. Munson's letter to the ALJ. No reference to it is made in the ALJ's opinion.

### E. Procedural History in the District Court

The Administrative Committee - U.S. Plans affirmed Prudential's decision in a letter dated March 10, 2003, finding Tracy had not met the definition for continued LTD benefits as he was capable of working with certain restrictions. J.A. at 389. It also noted that he had been day-trading up to 6-8 hours a day and had previously indicated an ability to work from home with flexible hours and secretarial/technical support.

On August 10, 2004, Tracy filed his complaint in this action in the United States District Court for the Eastern District of Michigan against the Plan, Pharmacia & Upjohn, Pfizer, Prudential, and Aetna Life Insurance Company ("Defendants") seeking continued payment of LTD benefits. The parties filed cross-motions for judgment on the administrative record, which were referred to a magistrate judge. The magistrate judge's report filed June 6, 2005, recommended that Tracy's motion should be denied and the Defendants' granted. On June 30, 2005, the district court issued an Order Adopting the Report and Recommendation of the Magistrate Judge, granting the Defendants' motion, and dismissing the case. Tracy filed this timely appeal.

### STANDARD OF REVIEW

The parties agree that, despite certain language in the plan, both the district court and this court review de novo Tracy's eligibility for benefits and construction of the terms of the plan.

### ANALYSIS

8

We begin with the relevant standards set forth in the Plan that are at issue in this case. As discussed, initial LTD benefit determinations are based on:

> [T]he existence or non-existence of a qualifying disability and will not depend on the availability of actual employment at Upjohn or elsewhere (i.e., an employee will not have a qualifying disability if physically and mentally able to perform in his customary or reasonable substitute employment at Upjohn even if there are currently no openings for him in such employment at Upjohn).

J.A. at 428. In other words, an employee must establish he is unable to work at Upjohn. Plaintiff argues not only that he met this standard, but also that Defendants admit that he met this standard. In order to be eligible for continuing LTD benefits, the standard is heightened, and the employee must be "unable to be *gainfully employed anywhere.*" J.A. at 429 (emphasis added). Again, the burden of proof is on the employee.

Tracy argues that, as applied to him, the "difference between the two Plan standards *in this case* is negligible." Appellant Br. at 25 (emphasis added). This is for two reasons. First, Defendants concede that Tracy could not perform his sedentary job with regular hours as a market researcher at Upjohn. Tracy points out that this was not, for example, a construction job where the difference between the physical demands of his previous occupation and a job "anywhere" is stark. Moreover, Tracy notes that Upjohn is "one of the largest corporations in the world, which boasts a diverse workforce in virtually every range of employment." Appellant Br. at 25. Secondly, Tracy points to the fact that the vocational consultant at Upjohn encouraged him to become a market researcher, exactly the type of job Upjohn told him he was incapable of doing at Upjohn.

Tracy misreads the Plan. As Defendants note in their brief, the Summary Plan Description ("SPD") distinguishes the two standards as follows:

9

- Due to health reasons, the employee is unable to perform their customary work at [Upjohn], and there is no reasonable expectation that the situation will change (improve).

- Due to health reasons, the employee is permanently unable to perform any work anywhere.

J.A. at 667. This interpretation is consistent with the language in the Plan itself.[5] Therefore, inability to work at Upjohn incorporates an inability to perform only customary or reasonably similar work duties, whereas the inability to work anywhere requires a disability that prevents any type of work in any place. The difference between these two standards is significant.

### A. Proper Weight to Be Given to the SSA Decision

As a preliminary matter we must determine the proper amount of weight, if any, to give to the SSA's finding that Tracy is disabled. At the outset, we note that the SPD states that, "[d]eterminations made by the [SSA], [etc.] are not relevant to determining a disability under [the Plan]." J.A. at 667. Nevertheless, Tracy received a fully favorable Notice of Decision of the ALJ as a result of the evidentiary hearing held to determine Tracy's disability status under the Social Security rules, J.A. at 298-306, and he contends that that decision should not be ignored because there was an evidentiary basis for the ALJ's conclusion, there is no contradictory evidence, and the evidentiary hearing represents the only independent evaluation of the evidence in this case.

---

[5]As previously mentioned, the Plan states that "[b]enefit determinations will be based on the existence or non-existence of a qualifying disability and will not depend on the availability of actual employment at Upjohn or elsewhere (i.e. an employee will not have a qualifiying disability if physically and mentally able to perform *in his customary or reasonable substitute employment at Upjohn...*)," J.A. at 428, which quite reasonably leads to the inference that the phrase, "gainfully employed at Upjohn" refers to "customary or reasonable substitute employment" at Upjohn.

10

Defendants point out that the standards for qualifying for SSA disability and for benefits under Upjohn's plan differ. Defendants claim that under the "treating physician rule," the ALJ must accord special weight to the treating physician. Defendants argue that neither conclusion at the SSA hearing (that Tracy is disabled and that jobs did not exist, which someone with his characteristics could perform) "bear[s] upon the Plan's standard for disability," (Def. Br. at 24) as the Plan's language requires a finding that Tracy cannot work "anywhere" and the disability standard requires that there is not a significant number of jobs in the economy that he could perform, *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). We also reiterate that the burden of proof is differently allocated. In the SSA proceeding, the government was obligated to show that Tracy could work, whereas here, Tracy must prove that he cannot.

This circuit has previously addressed the weight to be given to an SSA decision in *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). We rejected the suggestion that an SSA determination is "meaningless," but found that it is "not binding." *Id.* at 295. We further stated:

> While it is true that the SSA must apply the 'treating physician rule' in its determinations, that rule provides that deference is to be given to the opinions of treating physicians (over those of non-treating or reviewing physicians) where, *and only where,* there is objective support for those opinions in the record.... Hence, the SSA determination, though certainly not binding, is far from meaningless. As the Court said in *Black & Decker,* a plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physicians. Here, the SSA determination, *at a minimum*, provides support for the conclusion that an administrative agency charged with examining Calvert's medical records found, as it expressly said it did, objective support for Dr. Hester's opinion in those records.

*Calvert*, 409 F.3d at 294 (emphasis added) (citations omitted). Therefore, we agree that, despite the Plan language, the decision of the ALJ provides evidentiary insight. However, in line with the Plan

language and our earlier discussion, we review ALJ conclusions *de novo*.  In sum, while the SSA determination is not binding, some weight is to be given to the SSA determination that Tracy is disabled and unable to work.

## B. What Constitutes Gainful Employment

Before analyzing whether Tracy is unable to be "gainfully employed anywhere," we must determine what it means to be "gainfully employed" under the Plan.  This circuit has not yet defined what constitutes "gainful employment," but the Eleventh Circuit addressed a similar question in *Helms v. Monsanto,* 728 F.2d 1416 (11th Cir. 1984).  In *Helms*, the disability plan at issue provided that in order to be eligible for benefits an employee must be "prevented from engaging in *any occupation or employment* for remuneration or profit."  *Helms,* 728 F.2d at 1419 (emphasis added).  The court stated:

> Total disability under this type of provision is not considered to exist if the insured can follow any remunerative occupation, whether in his present vocation or another. The phrase should not be given an absolute and literal interpretation. It should not mean that the affected individual must be utterly helpless to be considered disabled. It must be a relative term which means that the individual is unable to engage in a remunerative occupation or to do work in some profitable employment or enterprise. Permanent disability is a question of fact that depends upon all the circumstances of a particular case.

*Id.* at 1420.  The court pointed out that it is difficult to define the phrase "any occupation or employment for remuneration for employment," because a "person would almost never be deprived of the ability to earn a nominal sum unless he is rendered completely immobile and without any cognitive ability." *Id.* at 1420.  The *Helms* court then drew from Social Security disability provisions and pointed out that in that context requirements for disability are "framed in terms of *gainful employment* and not just nominal employment." *Id.* at 1421 (emphasis added).

12

In this case, the Plan, like the Social Security Act, defines a qualifying disability as a disability that prevents "gainful employment." Thus, the reasoning from *Helms* is especially useful. The *Helms* court went on to state that:

> Although the achievements of disabled persons have been remarkable, we will not adopt a strict, literal construction of such a provision which would deny benefits to the disabled if he should engage in some minimal occupation, such as selling peanuts or pencils, which would yield only a pittance. The insured is not to be deemed "able" merely because it is shown that he could perform some task.

*Id.* at 1421. The court found that to bar recovery under the provision at issue ("any occupation") in that case:

> [T]he earnings possible must approach the dignity of a livelihood. [The plaintiff] is required to show physical inability to follow any occupation from which he could earn a reasonably substantial income rising to the dignity of an income or livelihood, even though the income is not as much as he earned before the disability.

*Id.* at 1421-22. This circuit has already agreed with the court in *Helms* "that the phrase 'prevented from engaging in every business or occupation' cannot be construed so narrowly that an individual must be utterly helpless to be considered disabled.'" *VanderKlok v. Provident Life and Acc. Ins. Co., Inc.*, 956 F.2d 610, 614 -15 (6th Cir. 1992) (quoting *Helms,* 728 F. 2d at 1421). Yet, in *VanderKlok*, this court established only that "a claimant's entitlement to payments based on a claim of total disability must be based on the claimant's ability to pursue *gainful employment* in light of all the circumstances," *id.* (quotation omitted) (emphasis added), and failed to further elaborate on what constituted gainful employment.

We now further adopt the holding in *Helms* that "gainful employment" is that employment from which a claimant may "earn a reasonably substantial income rising to the dignity of an income or livelihood, even though the income is not as much as he earned before the disability." *Id.* at 1421-

13

22; *see also Torix v. Ball Corp.*, 862 F.2d 1428 (10th Cir. 1988) (also adopting the standard set forth in *Helms*).

### C. Self-Employment

Defendants argue that Plaintiff could be "gainfully employed" under the meaning of the Plan by reason of self-employment as a day-trader of securities or as a consultant, even if he could not find employment with an employer because of a need to take a long noon rest. Thus, it is imperative that we address whether "gainful employment" includes self-employment. Under the above-discussed definition of "gainful employment," there are obviously some circumstances where such self-employment would result in a sufficient income. For example, an individual who had previously established himself or herself as a consultant, who maintained a viable client list, and who had the potential to earn enough to sustain a livelihood, might be gainfully employed. There will be some circumstances where an individual may be unable to find work for an employer due to his or her disability, but has both the experience and the likelihood of a sufficient income from self-employment to support a finding of "gainful employment."

As noted, Defendants cite to two possible income sources for Tracy: day-trading and self-employment as a consultant. Here Tracy himself stated he had engaged in *some* day-trading and *suggested* he could earn a substantial income as a day trader when he asked Defendant to advance $3,000 to $5,000 to permit him to attend some additional training in that employment. Additionally, the ALJ's opinion refers to the fact that Plaintiff spends five hours a day, five days a week day-trading. The record indicates that he may have spent even more time than that. It is silent, however, as to an amount he has actually earned from this endeavor. The extensive time he has devoted to

14

day-trading and his silence as to what he has actually earned justify the inference that he has been engaged in gainful employment. So does his previous conduct in continuing to draw disability while employed for over a year at full-time employment with two different employers.

### D. Alternatively, Even If We Do Not Rely on this Self-Employment, Has Tracy Established His Condition Prevents Him From Being Gainfully Employed?

Our review of the evidence leads us to conclude that Tracy, who has the burden of proof, has not established that he is unable to be gainfully employed, by an employer, anywhere.

Even though we may consider the findings by the SSA, we are not required to abide by its decision. We note initially that we do not have Plaintiff's testimony or other testimony in the SSA proceeding, but only the ALJ's opinion and Plaintiff's applications. Hence, we have not been provided with sufficient evidence to determine independently that Tracy suffers from a disability preventing him from being gainfully employed. Although the SSA decision resulted in a finding of disability, we are provided only with the ALJ's summary of medical and vocational reports that lead to that finding. While we give respectful weight to the findings of that court, such respect does not provide litigants *carte blanche* to transmute its findings to other circumstances in other fora.

In sum, Tracy has not met his burden of establishing that he suffers from this disability. The only doctor's report in the administrative record that supports his contention that he is unable to be gainfully employed is the response of Dr. Gungor to a work questionnaire. The following is the narrative portion of the report *in its entirety*:

> 6. In general, the patient has to take two naps a day. The first one up to one hour in the morning between 11 a.m. and 1 p.m. He takes the second nap between 3 p.m. to 6 p.m. This lasts for two hours.

15

9. The patient is impaired, all functions are interrupted. Once or twice a month, sometimes more often, the patient is unable to get out of bed all day. He gets up in the evening for a short period of time. He would eat, go back to the bedroom and then go back to sleep.

12. About twice a month, sometimes more often, the patient is unable to get out of bed all day. He gets up in the evening for a short period of time. He would eat, got back to the bedroom and go back to sleep. This would last for one or two days.

J.A. at 266. Many of the questions posed by the questionnaire were unanswered. Notably, Dr. Gungor failed to answer question seven, which requested that he report the medical findings that led to his conclusions. Such scant evidence from an incomplete medical report, even if otherwise uncontradicted, would appear to be insufficient.

Moreover, that evidence is controverted by other evidence in the record before us, but to which the ALJ makes no reference. First, there are medical reports indicating that Tracy is capable of work. Dr. Munson completed an attending physician's report and wrote a letter dated January 22, 1999, which stated that to improve Tracy's daytime functioning, "he should maintain a regular work-sleep schedule. This should include a consistent starting and ending time to his workday, as well as a normal eight-hour shift without overtime. These restrictions should remain in effect indefinitely." J.A. at 190. Also, Dr. Hurlbut's report, contemporaneous with Dr. Gungor's report and also provided by Tracy to support his appeal of the denial of benefits, paints a similar picture of Tracy: that of one who could work with accommodations.

Second, we note that Tracy held two separate jobs while on initial disability leave with Upjohn. From 1997 to 1998 he worked at Westwood Squibb, Bristol-Myers, as a Manager of Global Marketing Research (J.A. at 193), and from 1998 to 1999 Tracy worked at Searle as a Marketing Research Manager for an entire year (J.A. at 193). Tracy has indicated that he was forced to leave

16

his job at Searle because he could not work eleven hours a day. Yet this says nothing about whether he could work a typical eight-hour day. The record does not explain why he left Westwood Squibb.

Third and finally, Tracy has stated in various letters and interviews that he believes he is capable of work. In Tracy's response to Dr. Munson's request that he complete a medical evaluation form for Defendants, Tracy explained his situation candidly:

> I really need to qualify for [Upjohn]'s plan to be able to continue with their family healthcare coverage, and to potentially supplement my income, if it is ever needed. I feel like I am between a rock and a hard place. Although I cannot consistenly work eight hours a day, I can be productive. ... Therefore, I need to find temporary consulting positions. However, I need health insurance coverage for me and my family, if I am consulting - which [Upjohn] can provide.

J.A. at 182.

Tracy has simply not met his burden of establishing that he suffers from a disability preventing him from being gainfully employed. The court is confronted with only pieces of conflicting doctors' reports that, read together, do not establish that he suffers from a disability preventing him from being gainfully employed anywhere. Based on the totality of the evidence submitted, we agree with the district court that he has not carried his burden to prove he cannot work anywhere.

### E. The Glenn Decision

The recent decision of this court in *Glenn v. MetLife*, _ F.3d _, 2006 WL 2519293 (6th Cir. Sept. 1, 2006), is not to the contrary. While the decision was for the plaintiff in that case, the salient facts are distinguishable. Moreover, the reasoning in that case is in line with our own and bolsters our own conclusions.

17

Like Tracy's benefits, Wanda Glenn's disability benefits were reviewed after a two-year initial disability period. She suffered from "'severe dilated cardiomyopathy,' a disease of the heart muscle that causes the heart to become enlarged and, for that reason, to pump inadequately." *Id.* at *1 (internal citations omitted). Her employer's plan denied her permanent disability benefits after an administrative committee determined that she was not unable to be gainfully employed. That employer's plan, however, defined permanent disability as, "completely and continuously unable to perform the duties of *any* gainful work or service for which [she is] reasonably qualified taking into consideration [her] training, education, experience, and past earning." *Id.* (emphasis in original). In contrast, the Plan in the instant case defines permanent disability as, "unable to be gainfully employed anywhere," a more stringent standard.

More importantly, in *Glenn*, the plaintiff's treating physician, whom she had been seeing for medical treatment for her condition since it was diagnosed, submitted multiple lengthy and thorough reports describing her condition and specifically recommending that she not return to work. Before she went on her initial two-year period of leave, he stated that her "main problem now is stress at work**.** She ... does have physical as well as psychological stress. ... I feel that she may not be able to continue to work in any kind of environment that would cause any significant physical or psychological stress and demands." *Id.* (internal citations omitted). Although her doctor initially predicted that Glenn would be able to return to work, he later determined that her condition would not allow it. "She also continues to have significant difficulty in returning to even any kind of sedentary job because any kind of psychological stress at work causes significant problems with her cardiovascular condition and she decompensates fast." *Id.* at 9 (internal citations omitted). In conclusion, the *Glenn* court held that the administrative committee had erred because, "there was

no adequate basis for the plan administrator's decision not to factor in one of the major considerations in Glenn's pathology, that of the role that stress played in aggravating her condition and, in the language of the MetLife policy, in preventing her return to 'gainful work or service for which [she is] reasonably qualified taking into consideration [her] training, education, experience, and past earning.'" *Id.* at 12-13 (internal citations omitted).

In this case, however, there has been no indication that work exacerbates Tracy's condition or even that he is completely unable to work. Rather, one of his doctors has recommended, "a consistent starting and ending time to his workday, as well as a normal eight-hour shift without overtime" in order to improve his condition. J.A. at 190. While that letter from Dr. Munson is not as recent as Dr. Gungor's report, it is part of an attending physician's treatment history that is thoroughly presented in the record. While we would very much appreciate the insight of a more current evaluation, Dr. Gungor's is sparse and, while the ALJ referred to Dr. Gungor as a treating physician, we have no record of any treatment or of any tests that would lead us to conclude that he is a treating doctor. Most significantly, Dr. Gungor does not explain on what his conclusions are based. Finally, Tracy's history of work and stock-market activity over the past few years indicates that his present condition has not changed since Dr. Munson wrote his letter and as such does not render him "unable to be gainfully employed *anywhere*." J.A. at 428.

**CONCLUSION**

Thus, for the foregoing reasons, the district court's opinion is **AFFIRMED**.

19